**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
bscott@bursor.com
jwilner@bursor.com

*Attorneys for Plaintiff*

*[Additional counsel on signature page]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ELIA RAMIREZ, individually and on behalf of all others similarly situated,

Plaintiff,

v.

TRUSPER, INC. d/b/a MUSELY,

Defendant.

Case No. 5:24-cv-02012-EJD

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL INDIVIDUAL ARBITRATION**

Date: September 19, 2024
Time: 9:00am
Courtroom: 4
Judge: Hon. Edward J. Davila

## TABLE OF CONTENTS


PAGE(S)

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 2

ARGUMENT .......... 9

I. PLAINTIFF DID NOT AGREE TO ARBITRATE DISPUTES WITH DEFENDANT .......... 9

A. Legal Standards .......... 10

1. The Federal Arbitration Act .......... 10

2. Conspicuous Notice Required .......... 11

3. Browsewrap vs. Clickwrap vs. Sign-in Wrap Agreements .......... 11

4. Multi-Step Processes Do Not Render Enforceable Agreements .......... 13

B. Plaintiff Did Not Agree to Arbitrate via Step One of the Enrollment Process .......... 14

C. Plaintiff Did Not Agree to Arbitrate via Step Two of the Enrollment Process. .......... 17

D. The Participant Agreement Does Not Require Plaintiff to Arbitrate .......... 18

II. THE ARBITRATION PROVISION IS UNCONSCIONABLE AND UNENFORCEABLE .......... 19

A. The Arbitration Provision Is Procedurally Unconscionable .......... 19

B. The Arbitration Provision is Substantively Unconscionable .......... 20

III. IN THE ALTERNATIVE, PLAINTIFF SEEKS DISCOVERY .......... 21

CONCLUSION .......... 23

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*A & M Produce Co. v. FMC Corp.*,
135 Cal. App. 3d 473 (1982) .......... 20

*Almaznai v. S-L Dist. Co., LLC*,
2021 WL 4457025 (N.D. Cal June 21, 2021) .......... 21

*Armendariz v. Foundation for Health Psychcare Srvcs., Inc.*,
6 P.3d 669 (2000) .......... 19

*Beltran v. PeopleReady, Inc.*,
2023 WL 3092973 .......... 22

*Belyea v. GreenSky, Inc.*,
2020 WL 3618959 (N.D. Cal. July 2, 2020) .......... 21

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... passim

*Chiron Corp. v. Ortho Diagnostic Sys.*,
207 F.3d 1126 (9th Cir. 2000) .......... 10

*Doe v. Massage Envy Franchising, LLC*,
87 Cal. App. 5th 23 (2022) .......... 13

*Eiess v. USAA Fed. Sav. Bank*,
404 F. Supp. 3d 1240 (N.D. Cal. 2019) .......... 21

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) .......... 10

*Fisher v. MoneyGram Int'l, Inc.*,
66 Cal. App. 5th 1084 (2021) .......... 20

*Gutierrez v. Autowest, Inc.*,
114 Cal. App. 4th 77 (2003) .......... 20

*Hansen v. LMB Mortg. Servs., Inc.*,
1 F.4th 667 (9th Cir. 2021) .......... 10

*Hines v. Overstock.com, Inc.*,
668 F. Supp. 2d 362 (E.D.N.Y. 2009) .......... 14

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 11

*Justus v. Foley RV Ctr., LLC*
2022 WL 18863744 (E.D. Wash. Feb. 23, 2022) .......... 22

*Martinez-Serrano v. I.N.S.*,
94 F.3d 1256 (9th Cir. 1996) .......... 18

*McCoy v. Google, LLC*,
2021 WL 6882419 (N.D. Cal. Nov. 9, 2021) .......... 22

*McGhee v. N. Am. Bancard, LLC*,
2017 WL 3118799 (S.D. Cal. July 21, 2017) .......... 13, 16, 17, 18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) .......... 10

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 11, 12, 17

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) .......... 10

*OTO, L.L.C. v. Kho*,
8 Cal. 5th 111 (2019) .......... 20

*Parada v. Superior Ct.*,
176 Cal. App. 4th 1554 (2009) .......... 20

*Penthouse Int'l, Ltd. v. Barnes,*
792 F.2d 943 (9th Cir. 1986) .......... 19

*Sanford v. MemberWorks, Inc.*,
483 F.3d 956 (9th Cir. 2007) .......... 10

*Savetsky v. Pre-Paid Legal Servs., Inc.*,
2015 WL 604767 (N.D. Cal. Feb. 12, 2015) .......... 12

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) .......... 11, 13, 15

*Slaten v. Dick's Sporting Goods, Inc.*,
2024 WL 1136399 (C.D. Cal. Feb. 2, 2024) .......... 12

*Snow v. Eventbrite, Inc.*,
2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) .......... 12

*Snow v. Nectar Brand, LLC*,
2023 WL 2558544 (C.D. Cal. Mar. 2, 2023) .......... 17

*Sonic-Calabasas A. Inc. v. Moreno*,
311 P.3d 184 (2013) .......... 19

*Stover v. Experience Holdings*, Inc.,
978 F.3d 1082 (9th Cir. 2020) ..... 11

*Van Tassell v. United Mktg. Grp.*,
795 F. Supp. 2d 770 (N.D. Ill. 2011) ..... 14, 16

*Weber v. Amazon.com, Inc.*,
2018 WL 6016975 (C.D. Cal. June 4, 2018) ..... 17

*Whalen v. Facebook, Inc.,*
2022 WL 19934419 (N.D. Cal. Apr. 11, 2022) ..... 17

*Wilson v. Huuuge, Inc.*,
944 F.3d 1212 (9th Cir. 2019) ..... 14, 16, 18

**STATUTES**

9 U.S.C. § 4 ..... 1, 9, 10

28 U.S.C. § 1331 ..... 18

28 U.S.C. § 1332 ..... 18

Cal. Civ. Code § 56.10 ..... 1

Cal. Penal Code § 631 ..... 1

Cal. Penal Code § 632 ..... 1

**RULES**

Fed. R. Civ. P. 23 ..... 18

## INTRODUCTION

This case arises out of the egregious conduct of Defendant Trusper, Inc., d/b/a Musely ("Defendant" or "Musely"), an online healthcare provider, who embedded surveillance software into its website – www.musely.com (the "Website") – that allowed Meta Platforms, Inc. ("Meta") to contemporaneously intercept patients' personally identifiable information and protected health information as it was being communicated to Defendant. *See* Complaint (Dkt. 1) ¶¶ 2, 7, 20-22. In 2023, Plaintiff Ramirez visited Defendant's Website, at which time she searched for and purchased a treatment for dark brown spots on the skin. *Id.* ¶ 5. As part of the purchase process, as is the case with all purchases on the Website, Plaintiff answered a series of questions related to her skin condition so that a doctor could write a prescription. *Id.* Unbeknownst to Plaintiff and other visitors to Musely's website, at the time they used the Website, Defendant had embedded the above-described surveillance software – known as the Facebook Pixel – into the Website, which allowed Meta to intercept the personally identifying information and protected health information of Plaintiff and others in violation of the California Invasion of Privacy Act ("CIPA") Cal. Penal Code §§ 631 and 632, the California Medical Information Act ("CMIA"), Cal. Civ. Code § 56.10, and the California Constitution. *Id.* ¶¶ 7-8.

Defendant has moved to compel individual arbitration pursuant to §§ 3 and 4 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 3-4, arguing that Plaintiff entered into a binding arbitration agreement with Defendant that requires her to arbitrate this matter. *See* Dkt 14. While the Court should deny the motion and allow the case to move forward, at minimum, the Court should: (1) find that genuine issues of material fact exist as to whether Plaintiff and Defendant formed an agreement to arbitrate; and (2) order a jury trial on those issues.

The Court should deny Defendant's motion because, contrary to Defendant's argument, Plaintiff did not enter into an arbitration agreement with Defendant that requires arbitration of the present dispute. As set forth in more detail below, the facts show that Defendant failed to notify Plaintiff or any other reasonably prudent internet user: (1) of the existence of an arbitration agreement; or (2) that by using the Website, they agreed to arbitrate disputes with Defendant. This

conclusion is underscored by the fact that the byzantine process through which Defendant contends Website users agreed to arbitrate, required users to click on multiple links and navigate to multiple webpages before finding the purported arbitration provision. Such a multistep process is insufficient to form a valid arbitration agreement. Making matters worse, Plaintiff's investigation has revealed that at least one hyperlink Defendant contends directed Plaintiff to an arbitration provision, in fact, directed Website users to Defendant's Copyright Policy, which contained no arbitration provision. Finally, the purported arbitration provision at issue does not even require Plaintiff to arbitrate the present dispute.

Even if Plaintiff somehow entered into an arbitration agreement, the agreement is procedurally and substantively unconscionable and, therefore, unenforceable. Specifically, the agreement is an adhesion contract that requires Plaintiff to pay outlandish fees in order to litigate her claims. Moreover, the agreement contains a delegation clause that unlawfully delegates to an arbitrator the ability to determine whether a valid arbitration agreement exists in the first instance.

Finally, and in the alternative to the arguments set forth above, to the extent the Court determines that the factual record is insufficient to deny Defendant's motion, Plaintiff respectfully requests that the Court grant her leave to conduct fact discovery on the issue of the formation of an arbitration agreement. As discussed more fully below, Plaintiff requires discovery in order to demonstrate that she never agreed to arbitrate with Defendant.

## STATEMENT OF FACTS

***Defendant's Byzantine Enrollment Process***

Defendant is an online provider of custom prescription skincare treatments. Dkt. 1 ¶ 20. Defendant's motion makes clear that a Musely customer must embark on a byzantine three-step enrollment process before purchasing a product from Defendant.[1] *See* Dkt. 14-1 (Buchanan Decl.) ¶¶ 12-16. As discussed further below, common threads throughout the process are that: (1) a customer never has to affirmatively agree to any terms and conditions set forth in Defendant's Website, including Defendant's "Participant Agreement," which it contends contains an arbitration

[1] Only Steps One and Two of the process relate to whether Plaintiff entered into an arbitration agreement with Defendant. As such, Plaintiff only discussed Steps One and Two, here.

provision; (2) Defendant's Website conceals hyperlinks to its terms and conditions by failing to present hyperlinks in a color different than the color of all other Website text, failing to present the hyperlinks in all capital letters or in bolded font, and presenting the hyperlinks in a font that is smaller than surrounding text; and (3) the hyperlinks do not direct a customer directly to a webpage containing an arbitration provision. *See id.*; *see also* Declaration of Brittany S. Scott ("Scott Decl.") ¶¶ 2-3. Moreover, as discussed further below, should a customer figure out a way to land on the Participant Agreement, the sixteen-page agreement, among other things: (1) gives the customer no up-front warning that it contains an arbitration provision; and (2) affirmatively states that the provision "*is not intended to modify or limit substantive rights or the remedies available to the parties . . . through the judicial process . . . .*" *See* Dkt. 14-5 (Participant Agreement) at 1, 14-15[2] (emphasis added).

***Enrollment Process – Step One***

According to Defendant, in Step One of its byzantine enrollment process, a "customer is presented with the Telehealth Consent screen" (Dkt. 14-1 ¶ 13), a copy of which is depicted below:




[2] Citations to docketed entries are to the CM/ECF-stamped page numbers at the top of the page.

Dkt. 14-3. As shown above, the Telehealth Consent screen contains the words "Find My Doctor" in large, bright-pink font. *Id.* It then directs a customer in bolded text to "**Enter your home state.**" *Id.* (bold in original). A customer can proceed to the next page by clicking a large, bright-pink button containing the word "Next." *Id.* Above the bright pink "Next" button, is a phrase in non-bolded black font that says "I agree to the terms of Telehealth Consent." *Id.* Importantly, Defendant concedes that it ***pre-checks*** the box next to that phrase – *i.e.*, the customer is not required to take any action or to affirmatively agree to anything. Dkt. 14-1 ¶ 13. Further, while Defendant contends that the phrase "Telehealth Consent" is a hyperlink (*id.*), as shown above, the phrase is not written in a different color than surrounding text, nor is it set forth in italics or all capital letters. *See* Dkt. 14-3.

If a customer were to figure out that "Telehealth Consent" was actually a hyperlink and click on it, according to Defendant, the customer would be directed to a pop-up screen titled "Consent to Telehealth Services" (Dkt. 14-1 ¶ 13), a copy of which is depicted below:



×

**Consent to Telehealth Services**

Telemedicine involves the delivery of health care services using electronic communications, information technology, or other means between a health care provider and a patient who are not in the same physical location. Telemedicine may be used for diagnosis, treatment, follow-up and/or related patient education, and other necessary medical services.

The electronic systems used in the Services will incorporate network and software security protocols to protect the privacy and security of health information and imaging data, and will include measures to safeguard the data to ensure its integrity against intentional or unintentional corruption.

For Musely's full Telehealth Terms and Conditions please visit the terms page or click on the link provided below. By consenting to Telehealth you are agreeing to our full terms and conditions.

Dkt. 14-4. The "Consent to Telehealth Services" does not contain an arbitration agreement, nor does it reference the existence of such an agreement elsewhere. *Id.* Rather, the first paragraph of the pop-up screen provides a brief description of "telemedicine." *Id.* The second paragraph then sets forth a summary of how Defendant contends it protects customers' privacy. *Id.* The third paragraph, then states:

> For Musely's full Telehealth Terms and Conditions please visit the terms page or click the link provided below. By consenting to Telehealth you are agreeing to our full terms and conditions.

*Id.* Notably, despite directing a customer to "click the link provided below," there is no such link. *See* Dkt. 14-4. Moreover, while Defendant contends the phrase "terms page" is a hyperlink (Dkt. 14-1 ¶ 13), the phrase is not set forth in a different color than surrounding font, nor is it in larger, italicized or bolded font. *See* Dkt. 14-4. Further, given that Defendant directs a customer to either "visit the terms page or click the link provided below," Defendant made it appear as if the hyperlink was provided in the "link provided below," not the phrase "terms page."

Even if phrase "terms page" was a hyperlink, Defendant does not disclose the purported URL to which it linked. *See, generally*, Dkt. 14-1. Rather, Defendant merely asserts that if clicked, the purported hyperlink directed a customer to Defendant's "Participant Agreement." Dkt. 14-1 ¶ 13. Plaintiff discussed the "Participant Agreement" below. Further, as discussed below, Plaintiff has reason to believe that Defendant's Website hyperlinks did not function as Defendant contends. However, absent discovery, Plaintiff cannot know to what URL any hyperlink would have directed a customer.

***Enrollment Process – Step Two***

According to Defendant, Step Two of its byzantine enrollment process presents a customer with an "Account Creation screen" (Dkt. 14-1 ¶ 14), as depicted below:




Dkt. 14-6. As shown above, the "Account Creation" screen contains the words "Create an Account" in large, bright-pink font. It then requires a customer to complete a form containing, among other things, the customer's email address and first and last name. *Id.* Each field name for the "Create an Account" form is written in bold letters with a red asterisk next it, presumably to indicate the necessity of providing the information. Below the form fields, in large text is a button that states "Create Account." *See id.* The screen is designed to draw a customer's attention to the title of the screen, the various form fields and the "Create Account" button.

Prior to the "Create Account" button, Defendant placed the words "By signing up, you agree to Musely's <u>Privacy Policy</u> and <u>Terms of Use</u>." *Id.* The phrase is written in font that is smaller than the font used on most of the webpage. *See id.* Moreover, the phrase is not written in bolded letters and does not contain an asterisk to indicate that it sets forth any actions a customer

must take. *See id.* While Defendant contends that the phrase "Terms of Use" is a hyperlink (Dkt. 14-1 ¶ 14), the phrase is not set forth in color different than surrounding text, nor is it written in bold or italicized font, or font that is larger than other text on the page. *See id.*

Even if the "Terms of Use" phrase was a hyperlink, Defendant concedes that it did not direct a customer to an arbitration agreement. *See id.* Rather, according to Defendant, the link merely directed a customer "to a table of contents where . . . the customer can click on the Participant Agreement . . . ." *Id.* Thus, by Defendant's own admission, the hyperlink – to the extent it existed – did not directly take a customer to an arbitration agreement. Defendant does not state how a customer directed to the "table of contents" would know to click on the "Participant Agreement" or whether the table of contents made any reference to an arbitration agreement. *See, generally*, Dkt. 14-1.

***The Purported "Terms of Use" Hyperlink***

Nowhere in its motion or supporting declaration does Defendant disclose the URL to which the purported "Terms of Use" hyperlink in Step Two directed customers. *See, generally*, Dkt. 14, 14-1. Based on Plaintiff's investigation, Plaintiff believes the hyperlink directed a customer to "www.musely.com/terms." *See* Scott Decl. ¶ 2. As late as February 27, 2024, that URL directed customers to Defendant's Copyright Policy, as well as to a table of contents (on the right side of the page) for other information, as depicted below:



*Id.* As shown above, the table of contents references a "Participant Agreement." However, there is no indication that the Participant Agreement, or any other item in the table of contents, contains an arbitration agreement. Moreover, to reach the Participant Agreement, a customer would have to click on that phrase – *i.e.*, a customer could not scroll to the Participant Agreement from the Copyright Policy page. Scott Decl. ¶ 4.

Based on the information set forth above, Plaintiff is informed and believes that the purported "terms page" hyperlink in the pop-up screen described in Step One above also linked to the Copyright Policy – not to any Participant Agreement.

***The Participant Agreement***

According to Defendant's materials, the "Participant Agreement" is a sixteen-page document. *See* Dkt. 14-5. The first page of the Participant Agreement does not reference or otherwise warn customers that the Participant Agreement contains a purported arbitration agreement. *See id.* at 1. Indeed, the purported arbitration agreement is buried on pages 14 and 15 of the Participant Agreement. *See id.* at 14-15. The section in which the purported arbitration agreement is contained is titled "**7. Applicable Law**," not "Arbitration Agreement." *See id.* at 14 (emphasis in original). It is not until § 7.1 that Defendant raises the concept of arbitration. *See id.* Notably, Defendant does not highlight § 7.1 in bold, as it did for the overall title of § 7. *See id.* Rather, § 7.1 is merely referenced as "7.1 Arbitration." *Id.* Moreover, most of the section is written in the standard font used throughout the Participation Agreement, with only a single phrase written in all capital letters. *See id.* This is in contrast to Section 5 (Disclaimer of Warranties) and Section 6 (Limitation of Liabilities), which are written in all capitalized letters. *See id.* at 12-14.

While § 7.1 of the Participant Agreement purports to set forth an arbitration agreement, it also makes clear that "[t]his arbitration provision is not intended to modify or limit substantive rights or the remedies available to the parties . . . through judicial process." *Id.* at 15. Thus, by its own terms, § 7.1 makes clear that it is not intended to limit Plaintiff's rights or remedies available through the judicial process. *Id.*

To the extent that Plaintiff could somehow be forced to arbitrate this dispute, § 7.1 states that any arbitration "will be administered by the American Arbitration Association under its

Commercial Arbitration Rules . . . .” (the “Commercial Arbitration Rules”) rather than the American Arbitration Association’s Consumer Rules (the “Consumer Arbitration Rules”). *Id.* at 14. According to the Commercial Rules, the party bringing the claim is responsible for paying the administrative fees associated with the arbitration. *See* https://adr.org/sites/default/files/CommercialRules_Web.pdf at 38; https://go.adr.org/feeschedule. For an undetermined monetary claim, as is the case here, the initial filing fee is $7,700, and the final fee is $8,475. These administrative fees are separate from the fees that are required to be paid to the arbitrator. *See* https://go.adr.org/feeschedule. This is substantially more expensive for the moving party compared to the Consumer Rules, where only a $225 filing fee is assessed from the individual. *See* https://www.adr.org/sites/default/files/Consumer_Fee_Schedule_3.pdf. Further, it is significant that, nowhere in § 7.1, nor in any other part of the Participant Agreement, does Defendant agree to cover the fees, costs and expenses of any arbitration, subjecting Plaintiff to have to pay an unconscionable price in order to litigate her claims.

***Demand for Jury Trial***

Section 4 of the FAA grants a party alleged to be in default of an arbitration agreement the right to a jury trial on the issue of whether an arbitration agreement exists. *See* 9 U.S.C. § 4. To the extent the Court does not deny Defendant’s motion as a matter of law, pursuant to § 4 of the FAA, Plaintiff demands a jury trial on the making of an arbitration agreement with Defendant.

## ARGUMENT

### I. PLAINTIFF DID NOT AGREE TO ARBITRATE DISPUTES WITH DEFENDANT

Defendant contends Plaintiff entered into a valid sign-in wrap agreement with Defendant, which includes an arbitration agreement. Dkt. 14 at 13. According to Defendant “all elements for forming a valid agreement under California law are met[.]” Dkt. 14 at 15. Not so. The facts show that Plaintiff did not agree to arbitrate her claims or, at minimum, a genuine dispute of material fact exists as to whether the parties formed an agreement.

### A. Legal Standards

#### 1. <u>The Federal Arbitration Act</u>

Section 4 of the FAA addresses motions to compel arbitration. 9 U.S.C. § 4. Pursuant to § 4, a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration, may petition [a court with jurisdiction] . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* If the court determines that the "making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.* The party alleged to be in default of the agreement may demand a jury trial. *Id.*

The "first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate the dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). The court must determine: (1) whether there exists a valid agreement to arbitrate; and (2) if there is a valid agreement, whether the dispute falls within its terms. *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

When determining whether a valid and enforceable contract to arbitrate has been established for the purposes of the FAA, federal courts should apply "ordinary state-law principles that govern the formation of contracts to decide whether the parties agreed to arbitrate a certain matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

The summary judgment standard applies to motions to compel arbitration. *See Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 672 (9th Cir. 2021). In ruling on such a motion, a court must "give to the opposing party the benefit of all reasonable doubts and inferences." *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 (9th Cir. 2007). As set forth above, if "the existence of an arbitration agreement is at issue," courts use "state-law principles of contract interpretation to decide whether a contractual obligation to arbitrate exists." *Id.* at 681–82. "Although mutual assent is generally a question of fact, whether a certain set of facts is sufficient to establish a contract is a question of law." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023). A court can only grant or deny a motion to compel arbitration if there are no genuine

disputes of material fact as to whether an arbitration agreement was formed.

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). "[M]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). The party seeking to compel arbitration has the burden of showing mutual manifestation of assent. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023).

**2. <u>Conspicuous Notice Required</u>**

California law "is clear" that a person "is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Berman*, 30 F.4th at 864 (9th Cir. 2022). To establish notice sufficient to give rise to mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a way that made it clear "the consumer was assenting to *those very terms* when checking a box or clicking on a button." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 461 (2021) (emphasis added).

"Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. Thus, the onus is "on website owners to put users on notice of the terms to which they wish to bind consumers as consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1100 (9th Cir. 2023) (cleaned up); *see also Stover v. Experience Holdings*, Inc., 978 F.3d 1082, 1086 (9th Cir. 2020) ("[T]he party alleging the existence of a contract [] has the burden to prove each element of a valid contract—including mutual assent.").

**3. <u>Browsewrap vs. Clickwrap vs. Sign-in Wrap Agreements</u>**

"To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements have devised rules to determine whether

meaningful assent has been given." *Berman,* 30 F.4th at 856. "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) *the consumer takes some action, such as clicking a button or checking a box*, that unambiguously manifests his or her assent to those terms." *Id.* at 856 (emphasis added).

Two general paradigms of assent arise in modern-day internet transactions: "clickwrap" and "browsewrap" agreements. A clickwrap agreement "requires a user . . . to check a box or click an 'I agree' button after being presented with terms and conditions." *Savetsky v. Pre-Paid Legal Servs., Inc.*, 2015 WL 604767, at *3 (N.D. Cal. Feb. 12, 2015). Clickwrap agreements are "routinely [found] enforceable" where "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Slaten v. Dick's Sporting Goods, Inc.*, 2024 WL 1136399, at *4 (C.D. Cal. Feb. 2, 2024).

A browsewrap agreement contains "a notice that–by using the services of . . . the website–the user is agreeing to . . . the site's terms of service." *Id.* Unlike with a clickwrap agreement, where users have to check a box to proceed, with a browsewrap agreement users can "continue to use the website . . . without . . . even knowing that such [an agreement] exists." *Nguyen*, 763 F.3d at 1176. For this reason, "[c]ourts are more reluctant to enforce browsewrap agreements." *Berman*, 30 F.4th at 856.

More recently, courts have identified a third type of agreement—referred to as "sign-in wrap" agreement—that is a "hybrid" of clickwrap and browsewrap agreements. *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *4 (N.D. Cal. Oct. 19, 2020). Instead of requiring users to check a box or click "I agree" to the terms before using the service—as is the case with a clickwrap agreement—sign-in wrap agreements function more like a browsewrap agreement in providing that users automatically agree to the terms by registering or signing up for an account with the website. *Id.* Courts evaluate sign-in wrap agreements using the same standards applied to browsewrap agreements. *Id.* (sign-in wrap agreement must "either place the user on actual notice of the agreement or 'put[ ] a reasonably prudent user on inquiry notice of the terms of the contract.'").

There are at least two requirements for website notice to be considered reasonably conspicuous. *Berman*. 30 F.4th at 857. First, the notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* Second, "the fact that a hyperlink is present must be readily apparent. Simply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists. *Id.* The Ninth Circuit has emphasized that "[b]ecause our inquiry notice standard demands conspicuousness tailored to the reasonably prudent Internet user, not to the expert user, the design of the hyperlinks must put such a user on notice of their existence." *Id.* To this end, courts look for "customary design elements denoting the existence of a hyperlink include[ing] the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Id.*

**4. <u>Multi-Step Processes Do Not Render Enforceable Agreements</u>**

"When a contract is presented to a consumer on a computer screen, 'the *full context of any transaction is critical* to determining whether any particular notice is sufficient.'" *Doe v. Massage Envy Franchising, LLC*, 87 Cal. App. 5th 23, 31 (2022) (emphasis in original) (citing *Sellers*, 73 Cal. App. 5th at 454). Key to this analysis is whether the consumer was provided notice of the actual terms under which the consumer will be bound. *See Berman,* 30 F.4th at 855 (The sign-in wrap agreement will form an enforceable contract "if (1) the website provides reasonably conspicuous *notice of the terms to which the consumer will be bound*") (emphasis added); *Sellers*, 73 Cal. App. 5th at 461 (A provider must first establish the contractual terms were presented to the consumer in a way that made it clear "the consumer was assenting to *those very terms* when checking a box or clicking on a button.") (emphasis added). Courts have rejected purported agreement where a multi-step process is required for a website visitor to view the agreement at issue. *McGhee v. N. Am. Bancard, LLC*, 2017 WL 3118799, at *3–4 (S.D. Cal. July 21, 2017), *aff'd*, 755 F. App'x 718 (9th Cir. 2019) ("It stretches credulity to assert that the actual page that is linked to the application McGhee filled out does not govern that application, but rather another

page linked to the page that is linked to the application does"); *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019) ("courts decline to enforce agreements where the terms are available only if users scroll to a different screen, *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) [or] complete a multiple-step process of clicking non-obvious links, *Van Tassell v. United Mktg. Grp.*, 795 F. Supp. 2d 770, 792-93 (N.D. Ill. 2011)") (internal citations in original).

**B. Plaintiff Did Not Agree to Arbitrate via Step One of the Enrollment Process**

Defendant contends Plaintiff was placed on inquiry notice of Defendant's arbitration agreement via Step One of the enrollment process. Dkt. 14 at 14 (the "Telehealth Consent screen put Plaintiff on inquiry notice of the Participant Agreement."). The contention fails.

In *Berman*, the Ninth Circuit affirmed the district court's denial of a motion to compel arbitration where the defendant's relevant webpages contained "two lines of text in tiny gray font, which stated: 'I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy." 30 F.4th at 854. While the underlined terms were hyperlinks, "they appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink." *Id.* The above-described language was in close proximity to buttons the plaintiffs had to click on but which did not indicate that clicking thereon had any legal significance." *Id.* at 858. In holding that the webpages failed to place the plaintiffs on inquiry notice of an arbitration provision, the court found that the "textual notice was not conspicuous and did not explicitly inform [the plaintiffs] that by clicking on the 'continue' button they would be bound by the terms and conditions . . . ." *Id.*

With respect to Step One of the enrollment process, this case is analogous to *Berman*. Similar to the webpages in *Berman*, Defendant's "Find My Doctor" webpage contained one line of text in tiny gray font, which stated "I agree to the terms of Telehealth Consent." Dkt. 14-3. While Defendant contends the phrase "Telehealth Consent" was a hyperlink, it "appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink." *See Berman*, 30 F.4th at 854. Moreover, because Defendant prechecked the box next to the text (*see* Dkt. 14-1 ¶ 13), neither Plaintiff nor any reasonably prudent internet

user was required to affirmatively take any action vis-à-vis the statement. Further, as in *Berman*, the bright pink "Next" button that came after the purported hyperlink did not explicitly inform Plaintiff that by clicking on the button she would be bound to any terms and conditions. *Berman*, 30 F.4th at 858; *see also Sellers*, 73 Cal. App. 5th at 480–81 (finding the phrase "By clicking 'Start my trial' you indicate that you agree to the Terms of Service" insufficiently conspicuous even when it was near a large orange button titled "Start my trial," because the text was not in all capital letters, lacked contrasting font color, and was smaller than all other text on the webpage).

Even if Plaintiff or other reasonably prudent internet users clicked on the purported hyperlink, that link merely directed users to Defendant's "Consent to Telehealth Services" pop-up screen, which provided no notice of any arbitration provision. *See* Dkt. 14-1 ¶ 13; Dkt. 14-3. Instead, after two paragraphs describing telemedicine and Defendant's privacy practices, Defendant merely informed users that for its "full Telehealth Terms and Conditions please visit the terms page or click on the link provided below. By consenting to Telehealth you are agreeing to our full terms and conditions." Dkt. 14-3. As with the "Find My Doctor" webpage, the purported "terms page" hyperlink was written in the same gray font as the rest of the pop-up screen. *See id.* Moreover, as discussed above, because Defendant gave users the option of visiting the "terms page" or clicking on a link purportedly provided on the pop-up screen, a reasonably prudent internet user would not know that the phrase "terms page," written in gray font, was a link.

Making matters worse, the pop-up screen did not contain any "link provided below" that would take users to any terms and conditions. *See id.* Relatedly, Defendant has not provided the URL to which the purported "terms page" hyperlink directed users. *See, generally*, Dkt. 14-1. As discussed above, Plaintiff is informed and believes that the hyperlink, if any, would have directed Plaintiff and other reasonably prudent internet users to Defendant's Copyright Policy, which makes no mention of an arbitration agreement. Scott Decl. ¶ 3.

Additionally, nothing on the pop-up screen informs users how they could "consent[] to Telehealth" and, thereby, agree with Defendant's full terms and conditions. Indeed, nowhere on the pop-up screen is there a way for users to provide or otherwise acknowledge such consent. *See* Dkt. 14-3.

Finally, even if the byzantine process crafted by Defendant ultimately resulted in a reasonably prudent internet user finding the purported arbitration agreement (despite Defendant providing no notice of such an agreement), the fact that a user would have to click on multiple links to get to that agreement, renders the agreement unenforceable. *See McGhee*, 2017 WL 3118799, at *3–4; *see also Wilson*, 944 F.3d at 1221. On this point, *McGhee* and *Van Tassel* are instructive.

In *McGhee*, the plaintiff was required to accept the "Terms and Conditions" by clicking on a button next to the words "I have read and agree to the Terms and Conditions." *McGhee*, 2017 WL 3118799, at *2. The defendant argued that clicking the button also bound the plaintiff to the "Pay Anywhere User Agreement" which could be reached via a hyperlink on the Terms and Conditions page and which contained an arbitration agreement. *Id*. The court rejected this argument, ruling that "[i]f [the defendant] intended to have the 'Pay Anywhere User Agreement' control McGhee's claims, perhaps [the defendant] should have linked the application to that agreement. Instead, [the defendant] linked the application to the [Terms and Conditions] . . . . [T]he Court finds it is to this agreement to which McGhee assented." *Id*. at *4.

In *Van Tassel*, the website's Conditions of Use, which contained the arbitration clause, was only accessible to the website user after the user clicked a "Customer Service" link and then, from the linked webpage, clicked an additional link for the Conditions of Use. *Van Tassell*, 795 F. Supp. 2d at 792. The court found that "[t]his multi-step process to find the Conditions of Use is especially problematic because ChefsCatalog.com lacks any reference to the existence of the Conditions of Use or that they are binding on all users of the website." *Id*. In denying the defendant's motion to compel arbitration, the court noted that "the absence of any reference to the Conditions of Use coupled with the multi-step process to locate the Conditions of Use means that . . . users of the ChefsCatalog.com website could complete their purchases without ever having notice that their purchases are subject to the website's Conditions of Use." *Id*. at 793. *Van Tassel* has been cited by numerous courts in the Ninth Circuit for the idea that "'terms of use' will not be enforced where the link to a website's terms is buried at the bottom of a webpage or tucked away in obscure corners

of the website where users are unlikely to see it," including by requiring a multi-step process to find the agreement in question. *See Dickey v. Ticketmaster LLC,* WL 9096443, at *5 (C.D. Cal. Mar. 12, 2019); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014); *Whalen v. Facebook, Inc.,* 2022 WL 19934419, at *4 (N.D. Cal. Apr. 11, 2022); *Weber v. Amazon.com, Inc.*, 2018 WL 6016975, at *8 (C.D. Cal. June 4, 2018).

Just as in *McGhee* and *Van Tassel*, here, Plaintiff would have had to click on multiple links to find Defendant's arbitration provision in the Participant Agreement. As in *McGhee*, it would "stretch[ ] credulity to assert that the actual page that is linked . . . does not govern that application, but rather another page linked to the page that is linked . . . does[.]" *McGhee*, 2017 WL 3118799, at *3–4.

Ignoring the facts and Ninth Circuit controlling authority, Defendant contends Plaintiff agreed to arbitrate via Step One of the enrollment process. *See* Dkt. 14 at 14-15. However, the plain facts and *Berman* demonstrate that Plaintiff entered into no such agreement.

*Snow v. Nectar Brand, LLC*, 2023 WL 2558544 (C.D. Cal. Mar. 2, 2023), cited by Defendant (Dkt. 14 at 14-15), is distinguishable. In that case, unlike here, the plaintiff relied on the terms and conditions to which she purportedly did not agree to return the product at issue. *Id.* at *2. Based on that fact pattern, the court determined that if the plaintiff was able to access the terms and conditions at issue via the defendant's return policy, she also would have seen the more conspicuous link to the terms and conditions themselves. *Id.* This case does not involve similar facts.

**C. Plaintiff Did Not Agree to Arbitrate via Step Two of the Enrollment Process.**

Defendant's contention that Plaintiff agreed to arbitrate via Step Two of the enrollment process (*see* Dkt. 14 at 15), suffers from the same defects as its argument with respect to Step One. As in *Berman* and Step One, the text containing the purported "Terms of Use" hyperlink is written in tiny gray font, and the purported hyperlink is in the same gray font as the rest of the sentence. *See* Dkt. 14-6. Moreover, while the "Create an Account" webpage contains form field titles written in bold letters with red asterisks next them, there is no asterisk next to the "Terms of Use" language

and that language is not written in bolded text. *Id.* Additionally, Plaintiff's investigation has revealed the purported "Terms of Use" hyperlink directed users to Defendant's "Copyright Policy," not the "Participant Agreement" that Defendant contends contains the arbitration agreement. Scott Decl. ¶ 3.

Even taking Defendant's facts as true, the hyperlink merely directed users to a table of contents where users then needed to "click on the Participant Agreement." Dkt. 14-1 ¶ 14. As discussed above, a valid arbitration agreement does not exist where a user has to click on multiple links to find the agreement. *See McGhee*, 2017 WL 3118799, at *3–4; *see also Wilson*, 944 F.3d at 1221. Here, it is notable that Defendant does not state that the table of contents gave any indication of an arbitration agreement. *See, generally,* Dkt. 14-1. However, as demonstrated by Plaintiff's above-described investigation, the table of contents do not reference an arbitration agreement.

### D. The Participant Agreement Does Not Require Plaintiff to Arbitrate

Even if Defendant's byzantine enrollment process somehow resulted in Plaintiff agreeing to Defendant's Participant Agreement, the arbitration language buried in that agreement does not require Plaintiff to arbitrate her claims. Indeed, the arbitration language specifically states that the "provision is not intended to modify or limit substantive rights or the remedies available to the parties . . . through judicial process, which shall not be deemed a waiver of the right to demand or obtain arbitration." Dkt. 14-5 at 15. In other words, the arbitration provision – which Defendant drafted – makes clear that nothing about the provision is intended to modify or limit Plaintiff's rights or remedies through the judicial process. Those rights and remedies include the right to litigate her claims and those of similarly situated individuals in a court with jurisdiction over her claims. *See, e.g.*, Fed. R. Civ. P. 23; 28 U.S.C. §§ 1331-1332.

Defendant does not address this language in its motion and, therefore, has waived the issue. *See Martinez-Serrano v. I.N.S.*, 94 F.3d 1256, 1259 (9th Cir. 1996). Moreover, even if Defendant were to argue that it does not waive its right to demand or obtain arbitration, at best that argument highlights an ambiguity in the provision. That is, a provision cannot at once promise a plaintiff that it does not modify or limit her judicial rights and remedies while at the same time giving

Defendant the right to modify and limit those rights. Given that Defendant drafted the arbitration provision, the ambiguity must be construed against Defendant and must allow Plaintiff to proceed with her claims in court. *See Penthouse Int'l, Ltd. v. Barnes,* 792 F.2d 943, 948 (9th Cir. 1986).

Based on the facts and controlling authority, Plaintiff did not enter into an agreement to arbitrate with Defendant. To the extent the Court determines that an issue of fact exists as to whether Plaintiff entered into such an agreement, the Court should order a jury trial on the issue of contract formation after the parties have an opportunity to engage in discovery.

## II. THE ARBITRATION PROVISION IS UNCONSCIONABLE AND UNENFORCEABLE

To the extent the Court finds that Plaintiff entered into an arbitration agreement with Defendant, the Court still should find that Plaintiff is not required to arbitrate her claims because the arbitration provision is unconscionable. Under California law, unconscionability is a valid defense to a motion to compel arbitration. *Sonic-Calabasas A. Inc. v. Moreno*, 311 P.3d 184, 201 (2013). For an arbitration agreement to be unconscionable, the party opposing arbitration must show that the agreement is both procedurally and substantively unconscionable. *Armendariz v. Foundation for Health Psychcare Srvcs., Inc.*, 6 P.3d 669, 690 (2000). However, procedural and substantive unconscionability need not be present in the same degree. *Id.* Thus, the more substantively oppressive a contract, the less evidence is needed of procedural unconscionability and vice versa. *Id.* Procedural unconscionability focuses on oppression or surprise due to unequal bargaining power. *Id.* Substantive unconscionability focuses on overly harsh or one-sided results. *Id.*

### A. The Arbitration Provision Is Procedurally Unconscionable

To the extent Plaintiff entered into an arbitration agreement with Defendant, the agreement is procedurally unconscionable. First, the agreement was one of adhesion. *See id.* Defendant cannot dispute this. Plaintiff had no ability to negotiate the terms of the arbitration provision. If Plaintiff wanted to purchase a healthcare product from Defendant, Plaintiff had to agree to Defendant's terms.

Further, as demonstrated above, Defendant hid the fact that its Participant Agreement contained an arbitration provision. "Procedural surprise focuses on whether the challenged term is hidden in a prolix printed form or is otherwise beyond the reasonable expectation of the weaker party." *Parada v. Superior Ct.*, 176 Cal. App. 4th 1554, 1571 (2009); *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 128 (2019) (concluding procedural unconscionability was present where provisions were "visually impenetrable" and dense*); see also A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 490 (1982) (finding procedural unconscionability of consequential damage provision contained in middle of last page of an agreement in inconspicuous font). Here, there is clear procedural unconscionability. The first page and introductory paragraphs of the Participant Agreement make no reference to an arbitration provision. *See* Dkt. 14-5. Indeed, the arbitration provision is buried on page 14 of a sixteen-page agreement in a section titled "Applicable Law." *Id.* at 14. Within that section, the arbitration provision is not set forth in all capitalized or bolded letters, nor is it otherwise highlighted. *See id.* at 14-15. This is in contrast to the sections immediately preceding the "Applicable Law" section which, in fact, are written in all capitalized letters to demonstrate and highlight their importance. *See id.* at 12-14.

**B. The Arbitration Provision is Substantively Unconscionable**

The arbitration provision is also substantively unconscionable. First, "it is unconscionable to condition that[ arbitration] process on the consumer posting fees he or she cannot pay. It is self-evident that such a provision is unduly harsh and one-sided, defeats the expectations of the nondrafting party, and shocks the conscience. While arbitration may be within the reasonable expectations of consumers, a process that builds prohibitively expensive fees into the arbitration process is not." *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 90 (2003). Second, the fact that "the provision that arbitration would be governed by the American Arbitration Association (AAA) Commercial Rules," renders the provision substantively unconscionable because the Commercial Arbitration Rules "make the process more expensive for consumers than the otherwise applicable AAA Consumer Rules." *Fisher v. MoneyGram Int'l, Inc.*, 66 Cal. App. 5th 1084, 1104 (2021)

(finding arbitration clause substantively unconscionable where Commercial, rather than Consumer Arbitration Rules applied.)

As discussed above, the provision requires the parties to abide by the Commercial Arbitration Rules and not the Consumer Arbitration Rules. *See id.* at 14. Under the Commercial Arbitration Rules, Plaintiff is required to pay the administrative fees, which in this case will total more than $15,000. Beyond that, Plaintiff is minimally required to share in the cost of the arbitrator. Thus, to litigate her individual claims against a corporation, Plaintiff must expend in excess of $15,000. While Defendant could have inserted into the arbitration provision that it would cover the costs and expenses of arbitration, or otherwise opted to use the Consumer Arbitration Rules, it chose not to. Defendant's conduct cannot be seen as anything other than oppressive.

Moreover, as Defendant concedes, the Commercial Arbitration Rules contain a delegation clause that purport to delegate issues such as the "existence . . . or validity of the arbitration agreement . . . ." Dkt. 14 at 16. Such a provision is strictly unenforceable in California because the formation of contract issue is "not . . . delegable" to an arbitrator. *Belyea v. GreenSky, Inc.*, 2020 WL 3618959, at *3 (N.D. Cal. July 2, 2020) (rejecting assertion that "whether Plaintiff agreed to the Arbitration Provision" was a delegable issue and denying motion to compel arbitration); *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1248 (N.D. Cal. 2019) ("The issue of contract formation . . . is not a delegable gateway issue."); *Almaznai v. S-L Dist. Co., LLC*, 2021 WL 4457025, at *10 (N.D. Cal June 21, 2021) (explaining "whether a valid arbitration agreement exists" is "not a delegable gateway issue"). Based on the foregoing authority, the delegation clause at issue is substantively unconscionable and should be disregarded.

## III. IN THE ALTERNATIVE, PLAINTIFF SEEKS DISCOVERY

As set forth above, Plaintiff respectfully submits that the Court may deny Defendant's motion based on the existing record and, indeed, Plaintiff's argument above accepts many of the "facts" presented by Defendant as true. However, to the extent the Court determines that Plaintiff has not sufficiently rebutted Defendant's motion, Plaintiff respectfully requests leave to conduct

discovery on the issue of the formation of an arbitration agreement and the veracity of Defendant's purported evidence.

Leave to conduct discovery relating to the existence and enforceability of an arbitration clause is routinely granted. *See Beltran v. PeopleReady, Inc.*, 2023 WL 3092973, at *8 (N.D. Cal. Apr. 25, 2023) (granting "limited discovery related to the alleged contract formation and violation" to resolve conflicting evidence on a motion to compel arbitration); *McCoy v. Google, LLC*, 2021 WL 6882419, at *2 (N.D. Cal. Nov. 9, 2021) ("The Court granted Plaintiff's motion to enlarge time to respond to Defendant's motion to compel arbitration (Dkt. 66) and permitted limited discovery related to issues of arbitrability"); *see also Justus v. Foley RV Ctr., LLC*, 2022 WL 18863744, at *1 (E.D. Wash. Feb. 23, 2022), reconsideration denied, 2022 WL 18859630 (E.D. Wash. Mar. 16, 2022) ("a party can conduct pre-arbitration discovery if 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue.'").

Here, Plaintiff maintains that she did not enter into an arbitration agreement with Defendant. Indeed, as discussed above, Plaintiff's investigation has revealed that at least one hyperlink that Defendant contends directed a Website user to Defendant's arbitration provision, in fact, directed users to Defendant's Copyright Policy. Moreover, unlike its other exhibits, Defendant did not submit a copy of the Participant Agreement (which Defendant contends contained the arbitration provision) as it actually appeared on the Website, but rather merely submitted a printout of the full text. *See* Dkt. 14-5.

Relatedly, the only evidence submitted by Defendant is a single declaration to which the declarant attached various screenshots. *See, generally*, Dkt. 14-1. Notably, Defendant's evidence does not show that those screenshots accurately reflect the way in which the screens appeared to Plaintiff at relevant times or that the Website properly functioned on the date in question. Indeed, Defendant presents no evidence regarding the device, browser or screen-size used by Plaintiff at the time she viewed the Website. *Id*. Thus, at present, Defendant's "evidence" is nothing more than a series of demonstrative exhibits with no evidentiary value.

Based on the above, and in furtherance of her effort to show the lack of an enforceable agreement, Plaintiff seeks to serve interrogatories and requests for production of documents, as

well as to depose relevant witnesses, relating to the following topics: (1) the declaration submitted in support of Defendant's motion and whether the exhibits attached thereto accurately depict screens presented to Plaintiff at relevant times; (2) the purported hyperlinks purported presented to Plaintiff in Steps One and Two of the enrollment process, including the URLs embedded into those hyperlinks and to what webpage those URLs would have directed Plaintiff; (3) the functionality of the Website and relevant webpages at relevant times; (4) the design of the webpage on which the purported terms and Participant Agreement were located at relevant times; and (5) all versions of the Participant Agreement as implemented on the Website at relevant times.

## CONCLUSION

The Court should deny Defendant's Motion or, in the alternative, allow limited discovery for the purpose of determining the enforceability of the arbitration provision.

Dated: July 8, 2024

**BURSOR & FISHER, P.A.**

By: *<u>/s/ Brittany S. Scott</u>*
Brittany S. Scott

L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
bscott@bursor.com
jwilner@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-mail: scott@drurylegal.com

*Attorneys for Plaintiff*