UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ELIA RAMIREZ,<br>  Plaintiff,<br>v.<br>TRUSPER, INC.,<br>  Defendant. | Case No.  5:24-cv-02012-EJD<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 14 |

Plaintiff, Elia Ramirez ("Ramirez"), on behalf of herself and a class of other similarly situated individuals, brings claims against Defendant, a telehealth company known as Trusper, Inc., d/b/a Musely ("Musely"), alleging that Musley embedded surveillance software known as "Facebook Pixel" into its website that allowed Meta Platforms, Inc., to intercept patients' personally identifiable and protected health information in violation of various California privacy laws. Compl., ECF No. 1. Before the Court is Defendant's motion to compel arbitration pursuant to the Musely Participant Agreement ("Participation Agreement"). Mot., ECF No. 14. This motion is fully briefed. Opp'n, ECF No. 22; Reply, ECF No. 23.

Having carefully reviewed the relevant documents, the Court finds this matter suitable for decision without oral argument pursuant to Local Rule 7-1(b). For the reasons explained below, the Court **DENIES** Musley's motion to compel arbitration.

I.   **BACKGROUND**

Musley is a skincare company that connects customers to doctors for skin condition treatments through a nationwide telehealth service. Decl. of Steve Buchanan ("Buchanan Decl.") ¶ 2, ECF No. 14-4. Ramirez purchased a prescription treatment for a skin condition on Musley's

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
1

1   website on June 6, 2023.  *Id.* ¶ 23.  Prior to this purchase, Ramirez visited Musley's website on

2   three other occasions.  *See id.* ¶ 22.  Because Musley's service typically requires a doctor's

3   prescription, before making any purchase or even advancing to Musely's shopping cart, internet

4   users must first enroll by creating a customer account and providing information relevant to

5   finding a physician.  *Id.* ¶ 12.  Customers enroll for a Musely account through a three-step process.

6   *Id.*  Musley alleges that Step One and Step Two contain hyperlinks that lead internet users to the

7   Participation Agreement, which contains a binding arbitration clause.  *Id.* ¶¶ 13, 14.

     **A.    Step One: "Find My Doctor"**

9        First, any internet user who adds a product to the shopping cart and clicks "Next" is

10  prompted to Step One of the enrollment process, which is titled, "Find My Doctor."  *Id.* ¶ 13, Ex.



21  2.

22  *Id.*, Ex. 2.

23       In Step One, the internet user is prompted to "Enter your home state" into a box field.  *Id.*,

24  Ex. 2.  Under the box field is a pink pre-checked box with a sentence next to it that says, "I agree

25  to the terms of Telehealth Consent."[1]  *Id.*  This sentence is written in black and appears smaller

---

[1] Any emphasis in quotations throughout this Order appear in the original text.

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION

1    than the text above the box field. *Id.* The words "Telehealth Consent" are the same font size and

2    color as the rest of the sentence, but they begin with capital letters, are underlined, and contain a

3    hyperlink when clicked. *Id.* ¶ 13.

4    If an internet user clicks "Telehealth Consent," they are taken to another pop-up window

5    titled "**Consent to Telehealth Services**" that contains three paragraphs. *Id.* ¶ 13, Ex. 3.

*Id.*, Ex. 3.

The first two paragraphs describe telemedicine and how Musley protects its patients' privacy. *Id.* In the third paragraph at the bottom of the page, there is a sentence that reads: "For Musely's full Telehealth Terms and Conditions please visit the terms page or click on the link provided below. By consenting to Telehealth you are agreeing to our full terms and conditions." *Id.* There is no link "provided below" the message. *Id.* This sentence is written in the same font size and color as the sentences preceding it. *Id.* The words "terms page" are the same font size and color as the rest of the sentence, but they are underlined, and contain a hyperlink when clicked. *Id.* ¶ 13. If an internet user clicks "terms page," they are taken to the full Participation Agreement. *Id.*

Musely alleges that Ramirez initiated the enrollment process in Step One each of the four times she visited its website. *Id.* ¶ 29.

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
3

### B. Step Two: "Create an Account"

Second, after the internet user completes Step One, they are brought to another page titled "Create an Account" so they can communicate with their doctor. *Id.* ¶ 14, Ex. 5.



*Id.*, Ex. 5.

In Step Two, the internet user provides their name, an email address, and a password. *Id.* On the bottom of that page, a sentence reads, "By signing up, you agree to Musely's Privacy Policy and Terms of Use." *Id.* This sentence is written in the same font size and color as the sentences preceding it. *Id.* The words "Terms of Use" are the same font size and color as the rest of the sentence, but they begin with capital letters, are underlined, and contain a hyperlink when clicked. *Id.* ¶ 14.

If an internet user clicks "Terms of Use," Musley alleges that they are taken to a "table of contents" where the internet user can click a link directing them to the Participation Agreement. *Id.* The Court has no further information of what the table of contents looks like, as Musley does not provide a description, an image, or the hyperlink that leads to the table of contents. *See id.*

Ramirez's counsel conducted their own investigation of the hyperlink in "Terms of Use," which Ramirez believes is www.musely.com/terms. Decl. of Brittney S. Scott ("Scott Decl.") ¶¶

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
4

3, 4, Ex. 1, ECF No. 22-1.  This website directs internet users to a page with "Copyright Policy" appearing as the first section, and the words "Participation Agreement" in a side panel.  *Id.*, Ex. 1.



*Id.*  Musley objects to this evidence.  Reply 3–4.

Musley alleges that Ramirez created an account in Step Two on July 8, 2022.  *Id.* ¶ 29.

C. **Participation Agreement**

The Participation Agreement is a sixteen-page document.  Buchanan Decl., Ex. 4.  The arbitration clause is located on pages fourteen and fifteen under a section labeled "**7. Applicable Law**."  *Id.*

*Id.*[2]

Directly under the "**7.1 Applicable Law**" title, there is a paragraph providing that the laws

---

[2] This image depicts only a portion of the arbitration clause for illustrative purposes.

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
5

of the State of California apply to the Participation Agreement. *Id.* Underneath that paragraph, in the same font size, is the arbitration provision, which begins with "7.1 Arbitration." *Id.* The title "7.1 Arbitration" is written in the same font size and color as the paragraph text surrounding it. *Id.*

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As this language makes clear, "an arbitration agreement is a contract like any other." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023). And like other contracts, arbitration agreements are subject to generally applicable state law contract defenses. *Lim v. TForce Logs., LLC*, 8 F.4th 992, 999 (9th Cir. 2021). In determining whether to compel a party to arbitrate, the court must determine: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (internal quotation marks and citation omitted). Once it is established that a valid agreement to arbitrate exists, the burden shifts to the party seeking to avoid arbitration to show that the agreement should not be enforced. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000).

Parties seeking to avoid arbitration are subject to the same standards applicable to parties opposing summary judgment under Federal Rule of Civil Procedure 56. *See Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (finding summary judgment standard is appropriate because order compelling arbitration "is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate"). Therefore, the moving party bears the initial burden of informing the court of the basis for the motion. *Curry v. Matividad Med. Ctr.*, No. 5:11-CV-04662-EJD, 2013 WL 2338110, at *1 (N.D. Cal. May 28, 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party meets this initial burden, the burden then shifts to the opposing party to present specific facts showing that

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
6

1  there is a genuine issue for trial.  *Id.* at *2.

2  **III.    DISCUSSION**

3        For the following reasons, the Court finds that Musley failed to show that the Participation

4  Agreement is a valid and enforceable contract.

5        To form a contract under California law, there "must be actual or constructive notice of the

6  agreement and the parties must manifest mutual assent."  *Oberstein v. Live Nation Ent., Inc.*, 60

7  F.4th 505, 512–13 (9th Cir. 2023).  The "principle of knowing consent" required to establish

8  contract formation "applies with particular force to provisions for arbitration," *Knutson v. Sirius*

9  *XM Radio Inc.*, 771 F.3d 559, 566 (9th Cir. 2014), and with equal force to contracts formed

10 online, *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855–56 (9th Cir. 2022).

11       In the online context, internet contracts are classified "by the way in which the user

12 purportedly gives their assent to be bound by the associated terms" and generally fall on a

13 spectrum ranging from "clickwrap" to "browsewrap."  *Keebaugh v. Warner Bros. Ent. Inc.*, 100

14 F.4th 1005, 1014 (9th Cir. 2024) (citing *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 16 (Cal.

15 2021)); *see also Berman*, 30 F.4th at 856.  "[C]lickwrap" agreements are agreements in which a

16 website presents users with specified contractual terms on a pop-up screen and users must check a

17 box explicitly stating "I agree" in order to proceed.  *Berman*, 30 F.4th at 856.  Browsewrap

18 agreements, on the other end of the spectrum, are agreements in which a website offers terms that

19 are disclosed only through a hyperlink and the user supposedly manifests assent to those terms

20 simply by continuing to use the website.  *Id.*  In the middle of the spectrum are sign-in wrap

21 agreements, also known as "modified clickwrap agreement[s]," whereby a user is "notified of the

22 existence of the website's terms of use and advise[d] that by making some type of affirmative act,

23 often by clicking a button, she is agreeing to the terms of service."  *Moyer v. Chegg, Inc.*, No. 22-

24 CV-09123-JSW, 2023 WL 4771181, at *4 (N.D. Cal. July 25, 2023).

25       Here, the parties agree that the Participation Agreement is a modified sign-in wrap

26 agreement.  *See* Mot. 8–9; Opp'n 12–13.  Musley argues that Ramirez had inquiry notice of the

27 modified sign-in wrap Participation Agreement.  *See* Mot. 8.  Under California law, a sign-in wrap

28 Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION

7

1   agreement may be an enforceable contract based on inquiry notice if "(1) the website provides

2   reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the

3   consumer takes some action, such as clicking a button or checking a box, that unambiguously

4   manifests his or her assent to those terms." *Berman*, 30 F.4th at 856.

5       For the reasons explained below, the Court finds that Musley has failed to satisfy its

6   burden to show that notice of the Participation Agreement's terms on the website was reasonably

7   conspicuous.

8       **A.**    **Reasonably Conspicuous Notice of the Terms**

9       Reasonably conspicuous notice requires that notice is "displayed in a font size and format

10  such that the court can fairly assume that a reasonably prudent Internet user would have seen it,"

11  and if there is a hyperlink, the "the fact that a hyperlink is present must be readily

12  apparent." *Berman*, 30 F.4th at 857. Courts generally analyze two factors to determine whether

13  notice of the terms was reasonable: (1) the context of the transaction, and (2) the visual placement

14  of the notice. *See Keebaugh*, 100 F.4th at 1019.

15      **1.**    **Context of the Transaction**

16      When evaluating sign-in wrap agreements, courts generally evaluate the full context of the

17  transaction, including whether the transaction contemplated "a continuing, forward-looking

18  relationship" governed by terms and conditions. *Sellers*, 289 Cal. Rptr. 3d at 16.

19      Musley is correct that the context of Ramirez's visit to Musley's website to seek telehealth

20  services and ongoing prescription skincare treatment contemplates an ongoing relationship. Mot.

21  8–9. Particularly, Ramirez's commitment to a 60-day check in period with an e-Nurse upon

22  receipt of her treatment shows a continuing relationship whereby a reasonable user would expect

23  the relationship to be bound by terms and conditions. *Id.*; *see also, e.g., B.D. v. Blizzard Ent., Inc.*,

24  292 Cal. Rptr. 3d 47, 64 (Cal. Ct. App. 2022). Ramirez does not dispute this point.

25      However, even in the context of a forward-looking and continuing relationship, Musley

26  still had the obligation to ensure that the visual placement of the notice of the Participation

27  Agreement's terms was conspicuous. *Keebaugh*, 100 F.4th at 1019 ("The context of the

28  Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
8

transaction is a non-dispositive factor under California law, used to evaluate whether a website's notice is sufficiently conspicuous. Courts must still evaluate the visual aspects of the notice . . . . "). As explained below, the Court finds that Musley has failed to meet its obligation.

### 2. Visual Placement of the Notice

"A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text." *Sellers*, 289 Cal. Rptr. 3d at 29. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Berman*, 30 F.4th 857. Because "online providers have complete control over the design of their websites," *Sellers*, 289 Cal. Rptr. 3d at 16, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers," *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014). For example, in *Berman*, the Ninth Circuit found that two lines of small gray font that stated, "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy" failed to put the plaintiff on notice of the arbitration provision in part because the underlined terms "appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink." *Berman*, 30 F.4th at 856–57. Conversely, courts have also found that underlined text is sufficient "when viewed in the context of the overall design and content of the webpage." *Pizarro v. QuinStreet, Inc.*, No. 22-CV-02803-MMC, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) (finding reasonably conspicuous notice on an underlined hyperlink where (1) the hyperlink appeared "directly below" the action button, (2) the hyperlink was set off by "ample white spacing" and "primarily surrounded by text no larger than the notice itself," and (3) the "general design of the website," was "relatively uncluttered and ha[d] a muted, and essentially uniform, color scheme").

Here, the Court finds that the visual placement of the hyperlinks and multi-step process by which an internet user must engage to access the Participation Agreement is insufficient to provide

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
9

1 notice of the Participation Agreement's terms.

### a. Step One

In Step One, there is a sentence next to a pink pre-checked box at the bottom of the page that sates: "I agree to the terms of Telehealth Consent." Buchanan Decl., Ex. 2. "Telehealth Consent" is a hyperlink. *Id.* ¶ 13. This font is black and smaller that the information above it regarding selecting a home state. *Id.*, Ex. 2. "Telehealth Consent" is also in the same font size and color as the rest of the sentence, but it is underlined and capitalizes the first letters of each word. *Id.*

Whether this page provides reasonably conspicuous notice of the Participation Agreement's terms is a close question. While many cases have held that simply underscoring words with no other distinguishing design is insufficient to provide notice, *see, e.g., Berman*, 30 F.4th at 856–57, other cases have also held that underscoring words can be sufficient if, such is the case here, the words begin with capital letters and appear next to a bright pre-checked box and are relatively close to the action button on an uncluttered page with a contrasting background color. *See Ghazizadeh v. Coursera, Inc.*, No. 23-CV-05646-EJD, 2024 WL 3455255, at *8 (N.D. Cal. June 20, 2024) (collecting cases).

However, the Court need not resolve whether the appearance of "Telehealth Consent" provides sufficient notice that the words are a hyperlink that will lead an internet user to the Participation Agreement because it does not, in fact, lead the internet user to the Participation Agreement. Instead, if an internet user clicks "Telehealth Consent," they are taken to another pop-up window titled "**Consent to Telehealth Services**." *Id.* ¶ 13. At the bottom at that pop-up window, there is another sentence that says, "For Musely's full Telehealth Terms and Conditions please visit the terms page or click on the link provided below. By consenting to Telehealth you are agreeing to our full terms and conditions." *Id.*, Ex. 3. The words "terms page" is a hyperlink. *Id.* ¶ 13. There is no link provided below the message. *Id.*, Ex. 3. "Terms page" is written in the same font size and color as the rest of the sentence, but it is underlined. *Id.*

The Court finds several deficiencies with the notice provided on this second "**Consent to**

1  **Telehealth Services**" page.

2  First, not only are the words "terms page" merely underlined with no other distinguishing design or capitalization, but the location of the hyperlink is found within three paragraphs of text, not noticeably separated out or adjacent to any action button or colorfully checked boxes.

Second, given that the sentence directs an internet user to either "visit the terms page or click the link provided below," Musley made it appear as if the hyperlink was provided in the "link provided below," not the phrase "terms page." If an internet user is looking for a link below the message, it is even more unlikely that they would realize that the words "terms page" in the middle of the sentence provides a clickable pathway to another webpage.

Third, the hyperlinks' labeling presents even more confusion. While Musley alleges that hyperlinks will ultimately lead users to the Participation Agreement, it unreasonable to expect an internet user to comprehend the circuitous path involving selecting a hyperlink labeled "Telehealth Consent," to reach another page with a hyperlink labeled "terms page," only to reach a page with a completely different title, "Participation Agreement," where they will find the terms of their agreement.

Fourth, the capitalization of other words in the sentence which are not hyperlinks, such as "Telehealth Terms and Conditions" and "Telehealth," further confuses which words might be hyperlinks, if any.

Fifth, even if "terms page" did not suffer from these deficiencies, the multi-step process an internet user must endure to reach the "terms page" hyperlink further minimizes the chance that they will receive notice of the terms of the Participation Agreement. Courts commonly rejected agreements such as this, where a multi-step process is required for a website visitor to view the agreement at issue. *See, e.g., Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019) (noting that courts often decline to enforce agreements where the terms are available only if users scroll to a different screen or complete a multiple-step process of clicking non-obvious links, even where the terms are accessible via a conspicuous hyperlink in close proximity to a button necessary to the function of the website); *McGhee v. N. Am. Bancard, LLC*, 2017 WL 3118799, at *3–4 (S.D. Cal.

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
11

July 21, 2017), *aff'd*, 755 F. App'x 718 (9th Cir. 2019) ("It stretches credulity to assert that the actual page that is linked to the application McGhee filled out does not govern that application, but rather another page linked to the page that is linked to the application does"). The cases cited by Musely to the contrary did not consider the multi-step process to access the arbitration clause. *See, e.g., Dean v. OKCoin USA Inc.*, No. 24-CV-01331-PCP, 2024 WL 3522207, at *3 (N.D. Cal. July 23, 2024) (no discussion of multi-step process); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017) (same). The one case Musley cited from the Southern District of New York that approved a multi-step process to access a forum-selection clause is factually distinguishable. *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (access to the forum selection clause available through clicking "Terms of Service" on the second page of a sign-up process).

Finally, Musley failed to provide sufficient evidence that this hyperlink does, in fact, lead to the Participation Agreement. Musley has not provided the hyperlink attached to "terms page" or provided an image of the website to which "terms page" would lead. Instead, Musley attached an image of the Participation Agreement's text that does not appear to be displayed on a web browser. Buchanan Decl., Ex. 4.

Therefore, considering the numerous deficiencies in Step One of the enrollment process, regardless of how many times Ramirez may have engaged in Step One, the Court finds that the visual placements were insufficient to provide the required notice.

### b.   Step Two

In Step Two, there is a statement on the bottom of the account creation page that states, "By signing up, you agree to Musely's Privacy Policy and Terms of Use." Buchanan Decl., Ex. 5.

Similarly here, it is irrelevant to the Court's analysis whether the placement and design of "Terms of Use" is sufficient to put a reasonable internet user on notice that it is a hyperlink to the Participation Agreement because it also does not, in fact, lead the internet user to the Participation Agreement. Instead, if an internet user clicks "Terms of Use," Musley alleges that they are taken to another page with a "table of contents," and from this page, they can click on the Participation

Case No.:   5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
12

1 Agreement. *Id.* ¶ 14.

2 To begin, Step Two suffers the same deficiencies identified above regarding the multi-step
3 process to access the Participation Agreement. *See Wilson*, 944 F.3d at 1221; *McGhee*, 2017 WL
4 3118799, at *3–4.

5 But more importantly, the Court is unable to proceed with its analysis of whether the link
6 to the Participation Agreement is reasonably conspicuous because Musley failed to provide any
7 evidence of the table of contents for the Court to examine. The entirety of Musley's description of
8 the table of contents page states: "The underlined reference to the 'Terms of Use' is a hyperlink to
9 a table of contents where, once again, the customer can click on the Participant Agreement
10 attached hereto as Exhibit 4." Buchanan Decl. ¶ 14; Mot. 4 (using the same language from
11 Buchanan's declaration). Exhibit 4 is an image of the Participation Agreement, not the table of
12 contents that provides a link to the Participation Agreement. Buchanan Decl., Ex. 4. In its reply,
13 the table of contents is mentioned one more time: "The Telehealth Consent screen gave Plaintiff a
14 reason to click through to the 'full terms of use,' and the account creation screen likewise would
15 have directed her to the Participant Agreement via a table of contents screen." Reply 10.

16 Musley does not provide the hyperlink for the table of contents, attach a screenshot of the
17 table of contents, or provide any other evidence to describe this page any further, insisting instead
18 that the Court take Musley's word that the table of contents includes another reasonably
19 conspicuous link to the Participation Agreement.[3] Without more, it is simply impossible for the
20 Court to hold that this table of contents page provided reasonably conspicuous notice of the terms

---

[3] Based on Ramirez's counsel's investigation, Ramirez believes that the hyperlink for "terms of use" is www.musely.com/terms, which directs customers to Musley's Copyright Policy, with an option to look at the Participation Agreement in a side panel. Scott Decl. ¶¶ 3–4; *see also supra* Section I.A. Musley argues that Ramirez's counsel's declaration attesting to this investigation is inadmissible evidence. Reply 3–4. However, the Court need not rule on Musley's objection because Musley has failed to meet its own burden to provide any other evidence to inform the Court what the "table of contents" page presented to users, aside from its own counsel's declaration. It is Musley's burden, not Ramirez's, to produce the initial evidence to show a valid agreement to arbitrate. *Stover v. Experience Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020) ("[T]he party alleging the existence of a contract [] has the burden to prove each element of a valid contract—including mutual assent.").

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
13

of the Participation Agreement.

Therefore, notwithstanding the issues in Step Two's multi-step process, the Court finds that Musley has failed to satisfy its burden to present evidence to show that the visual placement of the final link to the Participation Agreement was sufficient to provide the required notice.

### c. Language of the Participation Agreement

Although unnecessary to the Court's finding, the Court also highlights that the actual arbitration clause is buried in the fourteenth page of the Participation Agreement under a misleading title, "**7.1 Applicable Law**."  It is unreasonable to expect a prudent internet user to click multiple inconspicuous hyperlinks labeled with different words to finally reach a Participation Agreement, where they now must scroll to the fourteenth page and find the arbitration clause under the "**7.1 Applicable Law**" section.  This deficiency further supports Ramirez's position that Musley failed to provide a reasonably conspicuous notice of the terms to which Ramirez could unambiguously manifest assent.

### B. Unambiguous Manifestation of Assent

Because Musley failed to show a reasonably conspicuous notice of the Participation Agreement's terms, the Court need not analyze whether Musley produced evidence of an unambiguous manifestation of assent.

## IV. CONCLUSION

Based on the foregoing, the Court **DENIES** Musley's motion to compel arbitration.

**IT IS SO ORDERED.**

Dated: October 11, 2024

EDWARD J. DAVILA
United States District Judge

Case No.: 5:24-cv-02012-EJD
ORDER DENYING MOTION TO COMPEL ARBITRATION
14