**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
jwilner@bursor.com

*Attorneys for Plaintiff*

*[Additional counsel on signature page]*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ELIA RAMIREZ, individually and on behalf of all others similarly situated,

Plaintiff,

v.

TRUSPER, INC. d/b/a MUSELY,

Defendant.

Case No. 5:24-cv-02012-EJD

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Date: June 25, 2026
Time: 9:00am
Courtroom: 4
Judge: Hon. Edward J. Davila

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. PLAINTIFF DID NOT CONSENT TO DEFENDANT'S CONDUCT ..... 2

A. Defendant Did Not Provide Adequate Notice of the Privacy Policy ..... 7

B. Defendant Has Not Carried Its Burden to Show Plaintiff Unambiguously Manifested Assent to the Privacy Policy ..... 8

C. The Privacy Policy Does Not Cover the Information Shared with the Third Parties ..... 9

II. PLAINTIFF STATES A CIPA § 631 CLAIM ..... 10

A. Plaintiff Pleads Defendant Aided, Agreed with, or Employed the Third Parties to Wiretap Plaintiff's Communications ..... 10

B. The Party Exception Does Not Apply ..... 12

C. Plaintiff Alleges Her Communications Were Intercepted "In Transit" ..... 13

III. PLAINTIFF STATES A CMIA CLAIM ..... 15

IV. PLAINTIFF STATES A VIOLATION OF THE CALIFORNIA CONSTITUTION AND INTRUSION UPON SECLUSION ..... 16

V. PLAINTIFF STATES A CIPA § 632 CLAIM ..... 18

A. Website Operators Are Liable Under § 632 ..... 18

B. Plaintiff's Health Information Is Confidential ..... 18

VI. THE CRIME-TORT EXCEPTION TO THE ECPA APPLIES ..... 19

CONCLUSION ..... 22

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Ambriz v. Google, LLC*,
2025 WL 830450 (N.D. Cal. Feb. 10, 2025) .......... 13

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 3, 4, 5, 7

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) .......... 17, 19

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) .......... 17

*Castillo v. Costco Wholesale Corp.*,
2024 WL 4785136 (W.D. Wash. Nov. 14, 2024) .......... 16

*Chabolla v. ClassPass, Inc.*,
129 F.4th 1147 (9th Cir. 2025) .......... 3, 5, 7, 8

*D'Angelo v. Penny OpCo, LLC*,
2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) .......... 14

*Doe v. Baystate Health System, Inc.*,
2026 WL 776861 (D. Mass. Mar. 19, 2026) .......... 20

*Doe v. Call-On Doc, Inc.*,
2025 WL 1677632 (S.D. Cal. June 13, 2025) .......... 2, 15

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) .......... 10, 20

*Doe v. Regents of the University of California*,
672 F. Supp. 3d 813 (N.D. Cal. 2023) .......... 17

*Doe v. Tenet Healthcare Corp.*,
789 F. Supp. 3d 814 (E.D. Cal. 2025) .......... 2, 15, 21

*Frasco v. Flo Health, Inc.*,
2024 WL 4280933 (N.D. Cal. Sept. 23, 2024) .......... 18

*Gilligan v. Experian Data Corp.*,
2026 WL 32259 (N.D. Cal. Jan. 6, 2026) .......... 20, 21

*Gladstone v. Amazon Web Services, Inc.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024) .......... 13

*Godun v. JustAnswer, LLC*,
135 F.4th 699 (9th Cir. 2025) ........ 3, 6, 8

*Graham v. Noom, Inc.*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) ........ 12

*In re Ambry Genetics Data Breach Litig.*,
567 F. Supp. 3d 1130 (C.D. Cal. 2021) ........ 17

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 9

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 16, 19

*In re Google Location Hist. Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) ........ 9

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........ 18, 20

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) ........ 8

*Jackson v. LinkedIn Corp.*,
744 F. Supp. 3d 986 (N.D. Cal. 2024) ........ 13

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) ........ 11

*Jones v. SkullCandy, Inc.*,
2026 WL 699819 (S.D. Cal. Mar. 12, 2026) ........ 18

*Krzyzek v. OpenX Techs., Inc.*,
2026 WL 206855 (N.D. Cal. Jan. 27, 2026) ........ 14, 20, 21

*L.B. v. LinkedIn Corp.*,
2025 WL 2899514 (N.D. Cal. Oct. 10, 2025) ........ passim

*Lee v. Plex, Inc.*,
773 F. Supp. 3d 755 (N.D. Cal. 2025) ........ 7

*Marden v. LMND Med. Grp., Inc.*,
2024 WL 4448684 (N.D. Cal. July 3, 2024) ........ 20

*Massel v. SuccessfulMatch.com*,
718 F. Supp. 3d 1112 (N.D. Cal. 2024) ........ 8

*Mata v. Zillow Grp., Inc.*,
2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) ........ 13

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d 916 (D. Minn. 2024) ........ 21

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........ 9

*Ojeda v. Kaiser Permanente Int'l., Inc.*,
2022 WL 18228249 (C.D. Cal. Nov. 29, 2022) ........ 16

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025) ........ 16

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) ........ 21

*R.S. v. Prime Healthcare Servs., Inc.*,
2025 WL 103488 (C.D. Cal. Jan. 13, 2025) ........ 21

*Ramirez v. Trusper, Inc.*,
2024 WL 4479862 (N.D. Cal. Oct. 11, 2024) ........ 2

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ........ 20, 21

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021) ........ 17

*Rusow v. Skinspirit Essential LLC*,
2025 WL 4657637 (N.D. Cal. Oct. 15, 2025) ........ 11

*Selby v. Sovrn Holdings, Inc.*,
2025 WL 2950164 (N.D. Cal. Oct. 17, 2025) ........ 14

*Semien v. PubMatic Inc.*,
2026 WL 216333 (N.D. Cal. Jan. 27, 2026) ........ 14, 20, 22

*Shah v. Cap. One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) ........ 20

*Smith v. Google, LLC*,
735 F. Supp. 3d 1188 (N.D. Cal. 2024) ........ 10

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 1085169 (N.D. Cal. Apr. 4, 2025) ........ 11, 13, 18

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 2210002 (N.D. Cal. Aug. 4, 2025) ........ 21

*St. Aubin v. Carbon Health Techs., Inc.*,
2024 WL 4369675 (N.D. Cal. Oct. 1, 2024) ........ 2, 15

*Stasi v. Inmediata Health Group Corp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020) ........ 17

*Stein v. Edward-Elmhurst Health*,
2025 WL 580556 (N.D. Ill. Feb. 21, 2025) ........ 21

*Taylor v. ConverseNow Techs., Inc.*,
2025 WL 2308483 (N.D. Cal. Aug. 11, 2025) ........ 13

*Turner v. Nuance Commc'ns, Inc.*,
735 F. Supp. 3d 1169 (N.D. Cal. 2024) ........ 10

*White v. PayPal Holdings Inc.*,
2026 WL 496712 (N.D. Cal. Feb. 23, 2026) ........ 8

**STATUTES**

18 U.S.C. § 2511(d) ........ 19

Cal. Civ. Code § 56.05(j) ........ 15

Plaintiff Elia Ramirez ("Plaintiff") respectfully submits this opposition to Defendant Trusper, Inc, d/b/a Musely's ("Defendant" or "Musely") Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 55) (the "Motion" or "MTD").

## INTRODUCTION

This case involves tracking technology that intercepts sensitive and confidential information, including private health information, on a healthcare-related website. Defendant sells custom prescription skincare treatments on its website, musely.com (the "Website"). *See* Plaintiff's First Amended Complaint (ECF No. 49) (the "FAC") ¶ 20. "Throughout its Website and marketing, Defendant emphasizes that it is a provider of medical services, that 'offer[s] prescriptions; not products'" *Id*. ¶ 21. However, patients' information related to their skincare conditions and the prescription treatments for those conditions is not kept confidential because "Defendant aids employs, agrees, and conspires with Meta [Platforms, Inc.], TikTok, and a host of other third parties to intercept communications sent and received by Plaintiff and Class Members [on its Website], including communications containing protected medical information" by affirmatively integrating tracking pixels into its Website and configuring them. *Id.* ¶ 2.

For instance, "[w]hen a Musely patient visits the page for a [prescription] dark spot treatment, the treatment purchased by Plaintiff, Meta deploys the Facebook Pixel with a pixel ID number of 1622201851376266, and automatically receives the page URL, which discloses the treatment sought, and the patient's Facebook ID via the c_user cookie." *Id*. ¶ 64. "Further, when a patient 'checks out' (completes a purchase) the Facebook Pixel, deployed with the same pixel ID number, receives another event, this time showing that an item was purchased from Musely and receiving a hashed version of the [person's email address]." *Id*. ¶ 65. "Similar interceptions are made by the TikTok Pixel. When a Musely patient visits the page for a dark spot treatment, the treatment purchased by Plaintiff, TikTok deploys the TikTok Pixel, and automatically receives the page URL, which discloses the treatment sought, and a hashed version of the patient's email address." *Id*. ¶ 67. "Consistent with the way [each] technology is created, [each third party] immediately views and processes the information and adds it to advertising data sets." *Id*. ¶ 68.

Similar allegations involving identical technology have survived motions to dismiss throughout this Circuit. *See*, *e.g.*, *St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675 (N.D. Cal. Oct. 1, 2024); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814 (E.D. Cal. 2025); *Doe v. Call-On Doc, Inc.*, 2025 WL 1677632 (S.D. Cal. June 13, 2025).

Musely's Motion does not tread any new ground. A provider of prescription healthcare is liable under the California Invasion of Privacy Act ("CIPA"), the California Confidentiality of Medical Information Act ("CMIA"), and the Electronic Communications Privacy Act ("ECPA") for disclosing confidential patient information via tracking pixels.

In contrast to the case law supporting the propriety of Plaintiff's claims, Defendant merely: (a) makes a strained consent argument that is premature and contrary to the actual terms of its Privacy Policy; and (b) asks the Court to subvert a well-established body of caselaw finding that health information is confidential under both the CIPA and common law. The Court should reject Defendant's arguments and deny Defendant's Motion.

## ARGUMENT

### I. PLAINTIFF DID NOT CONSENT TO DEFENDANT'S CONDUCT

Defendant contends Plaintiff "consented to disclosure of her personal information" and is therefore barred from bringing her claims. MTD at 8. This is wrong for multiple reasons.

First, as detailed in Plaintiff's Opposition to Defendant's Request for Judicial Notice, Defendant cannot introduce a screenshot of its private webpage to attempt to refute the clear allegations in the FAC.

Second, even if the Court could take judicial notice of the existence of the webpage: (a), it cannot take judicial notice of its contents; and (b) a question of fact exists as to what webpage Plaintiff would actually have seen. The webpage put forward by Defendant in the present motion is different than the signup page analyzed by the Court when it denied Defendant's Motion to Compel Arbitration. *Compare* MTD at 5 *with Ramirez v. Trusper, Inc.*, 2024 WL 4479862, at *2 (N.D. Cal. Oct. 11, 2024), aff'd, No. 24-6434, 2025 WL 2955231 (9th Cir. Oct. 20, 2025) (the "MTC Order"). As such, to the extent Defendant seeks to put forward a consent defense, Plaintiff

should first be entitled to discovery regarding the enrollment process(es) at issue.

Third, even if Defendant correctly sets forth the enrollment process, it cannot mount a consent defense because the webpage does not provide adequate notice of the Privacy Policy, Plaintiff never unambiguously manifested assent to the Privacy Policy, and the Privacy Policy does not disclose the conduct at issue.

Defendant contends that its sign-up page looked like this:




MTD at 5.

Three binding cases from the Ninth Circuit, *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022), *Chabolla v. ClassPass, Inc.*, 129 F.4th 1147 (9th Cir. 2025), and *Godun v. JustAnswer, LLC*, 135 F.4th 699 (9th Cir. 2025), evaluated the exact question before the Court here: "[u]nder what circumstances can the use of a website bind a consumer to a set of hyperlinked 'terms and conditions' that the consumer never saw or read?" *Berman*, 30 F.4th at 853.

The webpages in *Berman* contained hyperlinks that looked like this:




*Id*. at 859 (Appendix A).




*Id*. at 861 (Appendix B).

In *Berman*, similar to here, the defendants argued that "by clicking on the 'continue' buttons, [the plaintiffs] had agreed to the hyperlinked terms and conditions, including the mandatory arbitration provision." *Id.* at 854. The Ninth Circuit disagreed, holding "the design and content of the webpages [the plaintiffs] visited did not adequately call to their attention [] the existence of the terms and conditions…." *Id.* at 858. Specifically:

> [t]he text disclosing the existence of the terms and conditions … is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye. The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else. And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text.

*Id.* at 856-57 (cleaned up); *see also id.* at 857 ("Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists.").

Similarly, in *Chabolla*, the defendants argued that by clicking the "Continue" or "Sign up with Facebook" buttons the plaintiffs "agree[d] to arbitrate any claims against [them]." *Chabolla*, 129 F.4th at 1151. Again, the Ninth Circuit disagreed, holding "[b]ecause of the notice's distance from relevant action items, its placement outside of the user's natural flow, and its font—**notably timid in both size and color**, we find that it is 'deemphasized by the overall design of the webpage' and not 'prominently displayed'" and was therefore unenforceable. *Id.* at 1157 (emphasis added). Specifically, the Ninth Circuit held:

> The user is directed to the action box in the right third of the page and must enter an email to continue. For users (like Chabolla) who enter their email address, the most obvious and natural next step is to click "Continue." If a user continued to read down the page, they would see an option to "Sign up with Facebook." The notice of additional terms is found below the "Sign up with Facebook" option, on the periphery of where a user intending to use their email would be looking. *A reasonably prudent user would likely click "Continue" and read no further* if she had no intention of using Facebook. It is not apparent that a user agrees or commits to anything on screen 1 other than sharing her email address. Here, the notice seems to fade into the irrelevancy of other aspects of the page.

*Id.* (emphasis added); *see also id.* ("[B]ecause of the notice's distance from relevant action items, its placement outside of the user's natural flow, and its font—notably timid in both size and color, we

find that it is deemphasized by the overall design of the webpage and not prominently displayed on screen 1.") (cleaned up).

Finally, in *Godun*, the Ninth Circuit ruled that the following webpage did not provide reasonably conspicuous notice of the relevant hyperlink:




*Godun*, 135 F.4th at 705. Specifically, the "advisal is not [] located directly above or below the action button and is displayed in relatively small text. Considering the notice in the full context of the transaction, we would not expect a reasonably prudent internet user to be on inquiry notice of the contract." *Id.* at 712 (internal citations omitted).

The Ninth Circuit also reasoned that "an advisal that simply states that 'I understand and agree to the Terms and Conditions' but fails to 'indicate to the user what action would constitute assent' is not enough to invite an unambiguous manifestation of assent." *Id.* at 713.

As discussed in more detail below, applying these binding decisions here, Musely cannot

show that its sign-up screen put users on sufficient notice of the Privacy Policy hyperlink or that Plaintiff unambiguously manifested her assent to the purported Privacy Policy.

### A. Defendant Did Not Provide Adequate Notice of the Privacy Policy

First, Defendant did not provide Plaintiff with adequate notice of its privacy policy. Similar to *Berman*, the Privacy Policy hyperlink at issue here is in a "tiny gray font." *Berman*, 30 F.4th at 856. The text is in "font considerably smaller than the font used in the surrounding website elements" where "[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else." *Id*. at 856-857.

Further, the hyperlink is not identifiable as such because it is not in a different color than the surrounding text and is not in capital letters. *Berman*, 30 F.4th at 857 ("Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists."); *Chabolla*, 129 F.4th at 1157 (hyperlinks "timid in both size and color" were not sufficiently conspicuous).

And, like in *Chabolla*, the presence of a larger bright picture taking up the majority of the page and larger, easier to read font denoting the form fields to fill, the hyperlink at issue was "deemphasized by the overall design of the webpage." *Chabolla*, 129 F.4th at 1157; *see also L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *9 (N.D. Cal. Oct. 10, 2025) ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text.' Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage.") (Davila, J.) (internal citations omitted); *Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 766 (N.D. Cal. 2025) (finding lack of notice where "the notice is presented in small gray font at the bottom of the Sign-Up Page. Although it is legible, it is far less prominent than the colorful buttons that the user must click to create an account" and where "the 'Terms of Use' and 'Privacy Policy' [links] 'appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink.'"); *White v. PayPal*

*Holdings Inc.*, 2026 WL 496712, at *5 (N.D. Cal. Feb. 23, 2026) ("The text stating "By joining, I agree to Honey's TOS & Privacy Policy" was of a size sufficiently smaller than the text on the rest of the screen that many users would likely have had to squint to read it. The small font size was exacerbated by the color of the text, which was light gray against a white background and in contrast to the two large and colorful buttons on the screen.").

Based on the foregoing, Defendant did not provide reasonable notice of the Privacy Policy and therefore has not met its burden of showing consent. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1100 (9th Cir. 2023) ("It was Amazon's burden to show assent, not Jackson's to show lack thereof. Given Amazon's limited proffer, the court could not determine that there was assent").

### B. Defendant Has Not Carried Its Burden to Show Plaintiff Unambiguously Manifested Assent to the Privacy Policy

Even if Defendant had provided conspicuous notice of its Privacy Policy, Plaintiff did not unambiguously manifest her consent to be bound by the Privacy Policy. *Chabolla* and *Godun* clarified that the action button must match the advisal language for unambiguous manifestation of assent to exist. *Chabolla*, 129 F.4th at 1158 ("Screen 2 explains that '[b]y signing up you agree to our Terms of Use and Privacy Policy'; There is no 'sign up' button, and the only button on screen 2 reads 'Continue.' … It is up to the user to assume that entering a first and last name and clicking the "Continue" button amounts to "signing up" …. the resulting ambiguity is dispositive."); *Godun*, 135 F.4th at 713 ("Under *Chabolla*, the text on an action button matters insofar as it matches an advisal's explanation.").

Here, as in *Chabolla*, the advisal language, which references "signing up" does not match the action button, which directs the user to "Create Account" MTD at 5. Therefore, "there was no meeting of the minds under our precedent." *Godun*, 135 F.4th at 713.

"These distinctions may seem picayune, but website operators like [Defendant] have ultimate control over their design decisions. Nothing requires them to present terms as subtle hyperlinks to separate pages instead of, say, requiring users to scroll through the actual terms before signing up." *Massel v. SuccessfulMatch.com*, 718 F. Supp. 3d 1112, 1121 (N.D. Cal. 2024).

And "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014).

### C. The Privacy Policy Does Not Cover the Information Shared with the Third Parties

Even if the Privacy Policy was binding, it does not disclose what information would be shared and with which parties it would be shared.

"For a defendant to show consent through disclosures, the disclosures must 'explicitly notify' users of the practice at issue and must have only one plausible interpretation." *L.B.*, 2025 WL 2899514, at *4 (citing *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019)); *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 190 (N.D. Cal. 2019) ("Consent is only effective if the person alleging harm consented to 'the particular conduct, or to substantially the same conduct' and if the alleged tortfeasor did not exceed the scope of that consent."). Further, "[c]ourts have often found a lack of consent when the type of data collected, though conceivably included in the disclosure, falls outside the plaintiffs' reasonable expectations." *L.B.*, 2025 WL 2899514, at *6.

Here, the Privacy Policy confuses more than it clarifies and leaves users with the net impression that their health information is not shared the Third Parties. In its motion, Defendant focuses on which information Musely says it collects. MTD at 6 ("The Privacy Policy details the information collected through use of the Website…."). That is not the issue here. Rather, the issue is that for financial gain, Defendant, a medical provider, has configured its Website to allow third parties to intercept medical information and communications about the prescription treatments Defendant offers. Further, Defendant explicitly states it does not collect any medical information as part of the "personal information" it defines and states explicitly that the medical information it collects to provide treatment "will be shared via confidential channels to a doctor" and "will be handled in accordance with HIPAA requirements." Declaration of Sara Frey ("Frey Declaration") MTD at Ex. 2 pp. 6-7. This, of course, creates the opposite understanding of what Defendant contends in its motion. Consumers are being told their health information is either not being collected at all or, to the extent it must be collected, is being treated confidentially. Defendant's

focus on the section of its Privacy Policy regarding third party analytics providers does nothing to undo this fact because that section is silent as to the collection of health information or information regarding treatment, instead making vague representations about the sharing of "demographic and interest-level information." *Id*. at Ex. 2 pp. 10-11.

The above-described "disclosures" are, at a minimum, subject to multiple interpretations, making determination of their actual meaning inappropriate for resolution at this stage. *L.B.*, 2025 WL 2899514 at *7 ("Here, Plaintiffs provided specific information about themselves while in search of medical services. And while some of this information—i.e., name, age, date of birth, weight loss goals—may not be considered medical or private in isolation, the combination of these details and the fact that they were provided in the context of seeking medical services could place the data outside users' reasonable expectations of what LinkedIn collects. This is akin to Plaintiffs' example of a person peering over the front desk in a medical office to read a patient's chart …. Given the nature of this data, the Court finds it inappropriate to determine at this stage whether the information is so sensitive that there is no reasonable expectation it would be disclosed pursuant to LinkedIn's policy as a matter of law."); *Smith v. Google, LLC*, 735 F. Supp. 3d 1188 (N.D. Cal. 2024) (finding factual disputes regarding reasonable expectations and consent inappropriate for a motion to dismiss); *Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169 (N.D. Cal. 2024) (same); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1077-78 (N.D. Cal. 2023) (same).

## II. PLAINTIFF STATES A CIPA § 631 CLAIM

### A. Plaintiff Pleads Defendant Aided, Agreed with, or Employed the Third Parties to Wiretap Plaintiff's Communications

Defendant makes two misguided arguments with respect to Plaintiff's allegations that Musely violated Clause Four of CIPA § 631(a). First, Defendant argues that Plaintiff does not allege the Third Parties violated Clauses Two and Three of CIPA § 631(a). Second, Defendant

argues that Defendant did not intend for the interceptions to occur. MTD at 13-14. Both arguments require a tortured reading of Plaintiff's allegations.[1]

Plaintiff discusses the first argument in Sections II.B-C, below. With respect to the second argument, Plaintiff has alleged intent. "First, Plaintiff[] allege[s] that [Defendant] affirmatively embedded [the] Meta Pixel and [numerous other tracking pixels] into its website. Second, Plaintiff[] allege[s] that the purpose of Meta and [the other companies'] code is to 'track[ ] the people and type of actions they take' …. Therefore, it is plausible to infer from [Defendant's] alleged affirmative act of integrating the third-party code into its website that it knew Meta and [other third parties] would intercept personally identifiable information and that Defendant had the purpose of employing Meta and [other third parties] to do so." *Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169, at *4 (N.D. Cal. Apr. 4, 2025) (internal citations omitted); *see also James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 954 (N.D. Cal. 2023) ("[I]t can reasonably be inferred that Disney entered into a contractual arrangement with Oracle under which Oracle would collect information from EPSN.com website users so that Disney could market to and attract new customers. Disney may have an argument that website users agreed to tracking when they used the website, but that is a question of fact that cannot be determined at the 12(b)(6) phase of the proceedings.").

There is no doubt Defendant knew what the third-party providers were capable of doing, particularly in light of the letter it received from the Office of Civil Rights, which warned of the dangers of using such technology. *See* FAC at Ex. A. Defendant affirmatively loaded the tracking technologies on its Website and configured them. FAC ¶ 31 ("Defendant chose to include the Facebook Pixel on its Website."). This is sufficient to allege Defendant's intent. *Rusow v. Skinspirit Essential LLC*, 2025 WL 4657637, at *11-12 (N.D. Cal. Oct. 15, 2025) (distinguishing *Yeti* (cited by Defendant (MTD at 14) and similar cases on the grounds that "each dismissed a

---

[1] Defendant also attempts to seize on a scrivener's error referencing "memorialcare.org." Counsel apologizes for this error and will amend to fix the paragraphs at issue, if necessary, but Defendant's argument that this warrants dismissal ignores the entirety the FAC's allegations, which reference Defendant's Website throughout.

CIPA aiding claim because the defendants did not know of the underlying conduct that formed the violation, not because they did not know of the underlying conduct's illegality. Accordingly, the Court reads section 631 as only requiring intentional conduct, not knowledge of illegality. Under that standard, there is little question that Rusow sufficiently alleged that SkinSpirit was aware of and intended to allow LinkedIn and Google to intercept her communications.").

**B. The Party Exception Does Not Apply**

Defendant next argues CIPA's party exception applies to Musely's vendors. MTD at 15. This is wrong. Defendant asks this Court to follow *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823 (N.D. Cal. 2021) and its progeny to hold that the Facebook Pixel, TikTok Pixel, and a host of other advertising software are somehow extensions of Defendant's website.

As an initial matter, Defendant's contention is not consistent with *Graham*, which distinguished its decision regarding session replay software from cases about NaviStone and the Facebook Pixel, finding "NaviStone and Facebook were independent parties who mined information from other websites and sold it: NaviStone through its code on participating e-commerce sites and Facebook through its plug-ins on third-party sites." *Graham*, 533 F. Supp. 3d at 832. Thus, *Graham* stands for the proposition that allegations of "aggregation of data for resale," the conduct alleged in the FAC, cannot be overcome by the party exception. *Id.*; *see also* FAC ¶ 35 ("The Facebook Pixel code enables Meta not only to help Defendant with advertising to its own patients outside the Website, but also to include individual patients among groups targeted by ***other*** Facebook advertisers[.]"), *id.* ¶¶ 46-47 ("When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because TikTok itself is collecting the content of any conversation. That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant). Once TikTok intercepts website communications, it has the capability to use such information for its own purposes…"), *id.* ¶ 66 ("Meta immediately

views and processes the information and adds it to advertising data sets."), *id.* ¶ 68 ("TikTok immediately views and processes the information and adds it to advertising data sets.").

Further, the majority of courts in this District and beyond have rejected *Graham* altogether, instead applied what is known as the "capability" approach. *See, e.g.*, *Jackson v. LinkedIn Corp.*, 744 F. Supp. 3d 986, 994 (N.D. Cal. 2024) ("LinkedIn's argument fails because Jackson alleges not only that the DMV collected her personal information using the Insight Tag, but also that LinkedIn received this sensitive data and read and used it for its own marketing services."); *Ambriz v. Google, LLC*, 2025 WL 830450, at *3 (N.D. Cal. Feb. 10, 2025) ("For the reasons described by the *Javier* court, the capability test is the better application of the statute and the California Supreme Court's precedent to the facts of this case, and the Court will apply it here."); *Smith*, 2025 WL 1085169, at *3 ("The Court will follow the capability test for reasons described in *Ambriz v. Google*, 2025 WL 830450, at *3 (N.D. Cal. Feb. 10, 2025). Under this test, Plaintiff have pled that Meta and Attentive were third parties to the alleged communications because they have the capability of using the data collected through Rack Room's website for their own commercial purposes."); *Taylor v. ConverseNow Techs., Inc.*, 2025 WL 2308483, at *4 (N.D. Cal. Aug. 11, 2025) ("This Court agrees with the capability approach and finds sufficient allegations in the complaint to consider defendant a third party under that approach."); *Gladstone v. Amazon Web Services, Inc.*, 739 F. Supp. 3d 846, 850 (W.D. Wash. 2024) (same). This Court should do the same.

**C. Plaintiff Alleges Her Communications Were Intercepted "In Transit"**

Defendant argues "Plaintiff's FAC fails to allege sufficient facts establishing a third party intercepted communications 'in transit[.]'" MTD at 16. That is incorrect.

"While a plaintiff must do more than merely restate the pleading requirement of real time interception, the standard is not overly burdensome. For instance, allegations that communications are intercepted in real time through the use of computer code provides sufficient factual detail to support the 'in transit' requirement." *Mata v. Zillow Grp., Inc.*, 2024 WL 5161955, at *6 (S.D. Cal. Dec. 18, 2024) (cleaned up). "[A] pleading standard to the contrary would require the CIPA

plaintiff to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of the CIPA defendant." *D'Angelo v. Penny OpCo, LLC*, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023).

Here, Plaintiff sufficiently alleges the interception of communications in-transit. The operation of the Facebook and TikTok Pixels and what information they collect are described in great detail. FAC. ¶¶ 24-48. The FAC then alleges:

> Transmissions from users' browsers to Meta through the Facebook Tracking Pixel occur in the same manner on each website where the technology is loaded. When an action is taken on a website, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage …. The Facebook Tracking Pixel causes the browser to secretly and contemporaneously duplicate the communication with a website transmitting it to Meta's servers, alongside additional information that transcribes the communication's content and the individual's identity. This transmission is initiated by Meta's code and concurrent with the communications with the host website. Consistent with the way its technology is created, Meta immediately views and processes the information and adds it to advertising data sets, as described above.

*Id.* ¶ 66; *see also*, *id.* ¶ 68 (similar allegations regarding the TikTok Pixel).

The FAC also provides multiple examples of the above-described process occurring. *Id.* ¶¶ 49-68 (screenshots of specific selections on the Website intercepted by Meta and TikTok). Nothing more is required at this stage. *Selby v. Sovrn Holdings, Inc.*, 2025 WL 2950164, at *3 (N.D. Cal. Oct. 17, 2025) ("Plaintiffs allegations are not conclusory. The Complaint contains a detailed description of the pixel and related technology at issue, including screenshots of the source code. The Complaint adequately alleges that the interceptions occurred in transit.") (internal citations omitted); *Semien v. PubMatic Inc.*, 2026 WL 216333, at *8 (N.D. Cal. Jan. 27, 2026) ("The complaint includes detailed descriptions of how PubMatic's pixel technology purportedly works .... The complaint alleges that after the PubMatic pixel is loaded onto a user's browser, then it 'surreptitiously intercepts' the URL 'for each page of each website visited by the individual.'") (internal citations omitted); *Krzyzek v. OpenX Techs., Inc.*, 2026 WL 206855, at *7 (N.D. Cal. Jan. 27, 2026) ("OpenX's 'interceptions' occurred while users communicated with websites through

their browsing activities. While OpenX may be able to show that it does not actually intercept any communications in transit, that factual dispute is not appropriately resolved here.”).

## III. PLAINTIFF STATES A CMIA CLAIM

Defendant contends that Plaintiff's CMIA claim fails because she does not allege her “medical information” was disclosed. MTD at 17-19. This is wrong.

“The CMIA defines ‘medical information’ as ‘any individually identifiable information, in electronic or physical form ... regarding a patient's medical history, mental health application information, mental or physical condition, or treatment.’” *St. Aubin v. Carbon Health Techs., Inc.*, 2024 WL 4369675, at *9 (N.D. Cal. Oct. 1, 2024) (quoting Cal. Civ. Code § 56.05(j)). Courts have found that a medical provider's disclosure of long-form, full-string URLs that contain descriptive information regarding a patient's searches constitute the disclosure of medical information. *Id*.

As described in the FAC, patients go to Defendant's website to seek treatment for dermatological conditions and to purchase prescription treatments for those conditions. FAC ¶ 20-22 . And Plaintiff alleges she did just that. *Id.* ¶ 5. Further, Plaintiff alleges that Defendant's Website utilizes long-form, full-string URLs that were intercepted by the Third Parties. *Id*. ¶¶ 64-68**.** Based on those allegations, the full-string URLs intercepted by the Third Parties containing the conditions for which patients seek treatment related to patients' “physical condition” and the full-string URLs containing the prescription medication a Plaintiff purchased related to the “treatment” for those conditions. *Doe v. Call-On Doc, Inc.*, 2025 WL 1677632, at *16 (S.D. Cal. June 13, 2025) (“Plaintiff has plausibly alleged, by reasonable inferences, that she disclosed her medical condition as well as her PII and PHI when she sought treatment on Defendant's website. Accordingly, the Court DENIES Defendant's motion to dismiss on this basis.”); *St. Aubin*, 2024 WL 4369675 at *9 (“Plaintiff alleges that the URLs transmitted to Facebook and Google include: (1) the reason patients booked a medical appointment and the location for those appointments; and (2) patients' identifiable information including their device IDs, IP addresses, or Facebook IDs that could be used to personally identify patients. This constitutes a person's ‘mental or physical condition’ or a course of treatment falling under the CMIA's definition of ‘medical information.’”); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 841 (E.D. Cal. 2025) (“The court finds

Plaintiffs' FAC adequately alleges that the information Plaintiff Jane Doe and Plaintiff John Doe submitted on Defendants' Web Properties, which was subsequently disclosed to Meta, was "medical information" as defined by the CMIA. Plaintiff Jane Doe and Plaintiff John Doe assert Defendants transmitted their PHI, including information concerning their specific medical conditions, diagnoses, treatment, and treating physicians."); *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *5 (N.D. Cal. Mar. 28, 2025) ("Plaintiffs allege they made specific queries, including the type of therapy they sought, the faith background of their preferred therapist, their particular mental health issues, and their specific symptoms. Plaintiffs therefore plausibly allege they disclosed 'Medical Information' within the meaning of the CMIA."); *Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *13 (W.D. Wash. Nov. 14, 2024) (sustaining a CMIA claim where "Plaintiffs allege that Costco collected data about specific prescriptions they ordered and could link such data to Plaintiffs' identities through their personal Facebook accounts.").

## IV. PLAINTIFF STATES A VIOLATION OF THE CALIFORNIA CONSTITUTION AND INTRUSION UPON SECLUSION

Defendant argues that Plaintiff has not established a serious invasion of privacy occurred. MTD at 19. This misstates both the law and Plaintiff's allegations.

To state a claim for invasion of privacy, Plaintiff must allege: "(1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). Plaintiff has done so.

"It is well-settled under California law that, although not absolute, people have a privacy interest in their 'medical history and information.'" *Ojeda v. Kaiser Permanente Int'l., Inc.*, 2022 WL 18228249, at *6 (C.D. Cal. Nov. 29, 2022). Plaintiff properly pleads a specific, legally-protected privacy interest for herself and Class Members — namely, an interest in: "(1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class

Members' knowledge or consent." FAC ¶ 114. Therefore, Plaintiff has alleged a specific privacy interest in her medical information, as well as the medical information of Class Members.

Further, Defendant has no valid basis for arguing that its invasion of privacy was not highly offensive. Notably, Defendant ignores a host of recent cases that have held that surreptitious data collection meets the "highly offensive" requirement — even when the data at issue was only browsing data, as opposed to the highly-sensitive health information at issue here. *See, e.g.*, *Rodriguez v. Google LLC*, 2021 WL 2026726, at *8 (N.D. Cal. May 21, 2021) (holding the interception of browsing data was highly offensive given that Google "set an expectation that it would not save plaintiffs' activity on apps") (internal quotations omitted); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1079-80 (N.D. Cal. 2021) (finding the data collections to be highly offensive because Google's "representations regarding private browsing mode could have led users to assume that Google would not view their activity when in private browsing mode"); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 631 (N.D. Cal. 2021) (finding Google's actions highly offensive because Google's "representations regarding Chrome's sync function could have led users to assume that Google would not receive the personal information at issue . . . while unsynced").

Given that this case involves the disclosure of sensitive health information, it is nonsensical for Defendant to contend that the wiretapping of such information would not be highly offensive. *Doe v. Regents of the University of California*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023) ("Personal medical information is understood to be among the most sensitive information that could be collected about a person."); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1143 (C.D. Cal. 2021) (even negligent disclosure of medical information is "more likely to constitute an 'egregious breach of the social norms' that is 'highly offensive'"); *Stasi v. Inmediata Health Group Corp.*, 501 F. Supp. 3d 898, 926 (S.D. Cal. 2020) (disclosure of medical information "constitutes a serious invasion of privacy"); *L.B.*, 2025 WL 2899514 at *20 ("Given the nature of LinkedIn's alleged conduct and the sensitivity of the information shared here, the Court finds this issue is also inappropriate to resolve at the pleadings stage.").

## V. PLAINTIFF STATES A CIPA § 632 CLAIM

### A. Website Operators Are Liable Under § 632

In arguing for dismissal of Plaintiff's CIPA § 632 claim, Defendant rehashes its intent argument made in connection with Plaintiff's CIPA § 631(a) claim. MTD at 21. Again, Defendant is liable for loading the third-party trackers onto its website for the purpose of profiting from targeted advertising. *See* Argument § II.A, *supra*. Notably, Defendant's argument runs counter to the numerous motions to dismiss § 632 claims against website operators that have been denied. *See, e.g.*, *Jones v. SkullCandy, Inc.*, 2026 WL 699819, at *18 (S.D. Cal. Mar. 12, 2026); *Smith*, 2025 WL 1085169, at *5 (N.D. Cal. Apr. 4, 2025); *Frasco v. Flo Health, Inc.*, 2024 WL 4280933, at *4 (N.D. Cal. Sept. 23, 2024).

### B. Plaintiff's Health Information Is Confidential

Defendant argues that Plaintiff's "internet communications were not confidential." MTD at 21. This is wrong. "[W]hile internet-based communications are generally not 'confidential' for purposes of Section 632, '[c]ommunications made in the context of a patient–medical provider relationship are readily distinguishable from online communications in general.'" *L.B.*, 2025 WL 2899514, at *18 (citing *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 799 (N.D. Cal. 2022)).

This case mirrors *L.B.*, where this Court sustained the § 632 claims, finding:

> [T]he information allegedly shared here may not be as sensitive as the health-related data in *In re Meta Pixel Healthcare Litig.* The data sharing here occurred pre-services outside of a secured patient portal. However, while Plaintiffs may not have been communicating directly with medical care providers, they were still providing personal information in search of medical services. This could at least support a reasonable expectation that this information will be kept confidential.

*Id.*, at *18.

The same is true here. Plaintiff and Class Members submitted sensitive information for the express purpose of receiving prescription dermatology treatment and reasonably expected those communications to be confidential. FAC ¶¶ 20-21 ("Defendant specializes in selling "custom prescription skincare" treatments. Throughout its Website and marketing, Defendant emphasizes that it is a provider of medical services, that "offer[s] prescriptions; not products."). *Id.* ¶ 64

("When a Musely patient visits the page for a dark spot treatment, the treatment purchased by Plaintiff, Meta deploys the Facebook Pixel with a pixel ID number of 1622201851376266, and automatically receives the page URL, which discloses the treatment sought, and the patient's Facebook ID via the c_user cookie."), *id.* ¶ 65 ("[W]hen a patient "checks out" (completes a purchase) the Facebook Pixel, deployed with the same pixel ID number, receives another event, this time showing that an item was purchased from Musely and receiving a hashed version of the email entered during check out (identified by the ud[em] marking)."), *id.* ¶ 67 ("When a Musely patient visits the page for a dark spot treatment, the treatment purchased by Plaintiff, TikTok deploys the TikTok Pixel, and automatically receives the page URL, which discloses the treatment sought, and a hashed version of the patient's email address."), *id.* ¶ 78 ("On July 20, 2023, the OCR and FTC sent Defendant, through its CEO, Jack Jia, a letter to draw Defendant's attention to "serious privacy and security risks related to the use of online tracking technologies that may be present on [its] website or mobile application (app) and ***impermissibly disclosing consumers' sensitive personal health information to third parties***.") (emphasis in original), *id.* ¶ 124 ("Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant in part, due to the protected nature of the health information at issue.").

## VI. THE CRIME-TORT EXCEPTION TO THE ECPA APPLIES

Finally, Defendant argues that Plaintiff cannot state an ECPA claim because the crime-tort exception does not apply. MTD at 22-25. This is wrong.

There can be no violation of ECPA if "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(d). An exception to this exception exists, however, where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." *Id*. Courts have routinely found this "crime-tort" exception applies where plaintiffs: (1) "alleged that [technology companies] intercepted their communications for the purpose of associating their data with preexisting user profiles"; (2) that this "association of their data with preexisting user profiles violated state law" (*Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021)); and (3)

that the technology companies "benefited from this interception by using the information to sell ads to other third-party advertisers." *Marden v. LMND Med. Grp., Inc.*, 2024 WL 4448684, at *3 (N.D. Cal. July 3, 2024); *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1053 (N.D. Cal. 2025) (Plaintiffs also allege that Defendant intercepted the contents of the electronic communications for an unauthorized purpose, which resulted in tortious acts. Because Defendant's actions are allegedly tortious, the one-party exemption does not apply."); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022)*; Doe v. Meta Platforms, Inc.*, 690 F.Supp.3d 1064, 1076 (N.D. Cal. 2023) ("What [defendant's] true intent is, what steps it actually took to prevent receipt of health information, the efficacy of its filtering tools, and the technological feasibility of implementing other measures to prevent the transfer of health information, all turn on disputed questions of fact that need development on a full evidentiary record."); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1090 (N.D. Cal. 2025); *Gilligan v. Experian Data Corp.*, 2026 WL 32259, at *3 (N.D. Cal. Jan. 6, 2026) ("[T]he disclosure and use of Plaintiffs' information for advertising can plausibly constitute an independent invasion of privacy beyond the act of intercepting the information alone, satisfying the crime-tort exception."); *Semien*, 2026 WL 216333, at *9-10; *Krzyzek*, 2026 WL 206855 at *8; *Doe v. Baystate Health System, Inc.*, 2026 WL 776861, at *3-5 (D. Mass. Mar. 19, 2026).

Plaintiff has sufficiently alleged the crime-tort exception to the one-party consent exemption to liability under the ECPA. *See* FAC ¶ 66 ("When an action is taken on a website, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage .... Consistent with the way its technology is created, Meta immediately views and processes the information and adds it to advertising data sets."), *id.* ¶ 68 (similar allegations for TikTok), *id.* ¶ 128 ("Meta and other third parties utilized Plaintiff's and Class Members' sensitive personal and health information for its own purposes, including for targeted advertising."). That Defendant's conduct was related to commercial activity does not excuse its liability. As Judge Tigar recently held in a similar case:

> [T]his Court is not persuaded that commercially exploiting unlawfully obtained information is 'licit' merely because it is profitable.

> …
>
> The existence of an underlying financial motivation does not mean that the act lacked a criminal or a tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime—it was to make money.

*Riganian*, 791 F. Supp. 3d at 1090-91 (denying to "adopt any bright-line rule insulating financial motives from the crime-tort exception") (cleaned up).

Judge Tigar is not alone in his reasoning. *See, e.g.¸ R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *7 (C.D. Cal. Jan. 13, 2025) (finding under the alternate reading, "the ECPA would not prohibit a person from intercepting a communication with the intent to use that communication to blackmail so long as the ultimate reason for the blackmail was to make money"); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 850 (E.D. Cal. 2025) ("financial[] motivate[ions] … do not immunize Defendants from liability under the ECPA"); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901 (C.D. Cal. 2024) (rejecting Defendant's reasoning); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 928 (D. Minn. 2024) ("the Court has serious doubts that a pecuniary purpose and an injurious purpose can always be so clearly distinguished. And it defies common sense that a clearly harmful act could escape liability as long as it was done for profit."); *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *6 (N.D. Ill. Feb. 21, 2025) ("the existence of a financial motivation is not a get-out-of-liability-free card"); *R.C.*, 733 F. Supp. 3d at 901-02 (collecting cases); *Smith v. Rack Room Shoes, Inc.*, 2025 WL 2210002, at *5 (N.D. Cal. Aug. 4, 2025) (explaining that "the crime-tort exception applies when a party uses intercepted communications to blackmail someone, even if the primary motivation for engaging in blackmail is to make money"); *Gilligan*, 2026 WL 32259, at *3 ("[B]eing primarily motivated to make money does not preclude application of the crime-tort exception, which is adequately alleged to apply here."); *Krzyzek*, 2026 WL 206855 at *8 ("The Court is not persuaded by the authorities OpenX cites to argue financial motives cannot constitute tortious motive. As numerous lower courts have found, being primarily motivated by profit does not render the crime-tort exception inapplicable. Where, as here, plaintiffs adequately alleged invasion of privacy, the Court is not convinced that

ECPA's crime-tort exception does not apply.") (internal citations omitted); *Semien*, 2026 WL 216333, at *10 (same).

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion.

Dated: March 30, 2026

**BURSOR & FISHER, P.A.**

By: *<u>/s/ Joshua R. Wilner</u>*
Joshua R. Wilner

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
jwilner@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury (State Bar No. 355002)
6 Carriage Lane
Highwood, Illinois 60040
Telephone: (312) 358-8225
E-mail: scott@drurylegal.com

*Attorneys for Plaintiff*